# Richmond

ALEXANDRIA GAZETTE CORPORATION v. MARION B. WEST.

June 18, 1956.

Record No. 4508.

Present, All the Justices.

The opinion states the case.

*Henry B. Crockett* (*John Barton Phillips*, on brief), for the plaintiff in error.

*John G. Drake* (*Green, Trueax & Smoot*, on brief), for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

On September 2, 1954, Marion B. West instituted this action against The Alexandria Gazette Corporation by motion for judgment for damages. The motion charged both common law libel and a viola-

tion of the insulting words statute (§8-630, Virginia Code, 1950), by the defendant in the publication of a news article. No malice was alleged, nor were punitive damages prayed for.

A demurrer to the motion was overruled and thereupon The Alexandria Gazette Corporation filed its answer. The answer denied that the printed statement complained of was libelous or defamatory of the plaintiff. It averred that its publication was privileged, disclaimed any malice in publishing and circulating the news article, and denied that the plaintiff had suffered any damage therefrom. Trial was held on April 25, 1955, and resulted in a verdict and judgment for $2,500 in favor of the plaintiff.

There are five assignments of error, which charge that the trial court erred in overruling the demurrer, in refusing to strike the evidence of the plaintiff at the conclusion of plaintiff's evidence, in the granting and refusing of certain instructions, that the verdict was contrary to the law and the evidence, and that the amount found by the jury was excessive.

In view of the undisputed evidence, the pivotal questions are: Whether or not the publication was privileged, and, if privileged, whether the privilege was abused.

The circumstances preceding and attending the publication of the news article were as follows:

Marion B. West, plaintiff, was, at the time of and prior to the publication of the news article, a practicing attorney in the City of Alexandria, Virginia, and also Judge of the Juvenile and Domestic Relations Court for that City. The Alexandria Gazette Corporation owns and publishes a daily newspaper with general circulation in the City of Alexandria and in other portions of Virginia, known as "The Alexandria Gazette."

On September 3, 1953, Jean Welke, a reporter employed by the defendant, visiting the Clerk's Office of the Corporation Court of the City of Alexandria, discovered that the following notice, with affidavit attached, had been filed in a divorce proceeding:

"Virginia

In the Corporation Court of the City of Alexandria

Richard Clyde Williams,
 Complainant
  vs.                                In Chancery No. 8541
Clarice Ruth Williams,
 Defendant

## NOTICE

To: Marion B. West and
Thomas A. Mickler,
Burke & Hurbert Bank Building
Alexandria, Virginia

Take notice that on the first day of the September, 1953 term at 10 A. M. of that day or as soon thereafter as the matter may be heard in the court room thereof, I shall move the Court to disqualify you and or both of you, your agent, associate, or any one connected or associated as an attorney at law, as counsels and or counsel for the complainant because the above styled cause originated in the Juvenile and Domestic Relations Court of Alexandria, Virginia, or should have originated in the said Juvenile and Domestic Relations Court, in which said Marion B. West is judge, and to proceed otherwise would be further unjust, impartial, unfair, unethical, and an undue disadvantage to the defendant.

Clarice Ruth Williams, by her next friend,
Claude Phillip Evans
By Otto L. Tucker
Counsel

Otto L. Tucker
Counsel for Complainant
901 Princess Street
Alexandria, Virginia

I hereby certify that I have mailed copies of the foregoing notice to Marion B. West & Thomas A. Mickler, Counsels for the Complainant, Burke and Hurbert Bank Building, Alexandria, Virginia, this 3rd day of September, 1953.

Otto L. Tucker
Counsel for complainant"

The affidavit attached thereto reads as follows:

"This day personally appeared before me a Notary Public in and for the City of Alexandria, State of Virginia, Clarice Ruth Williams who, being by me first duly sworn, on her oath says:

'I went down to the Juvenile and Domestic Relations Court in Alexandria, Virginia, and saw Raye Luckett, the social worker, to ask how much would I get for support of my baby. Raye Luckett said send Richard (her husband) to see her before I went to see

Judge West, and I was given an appointment to see her the next morning with my husband. Raye Luckett asked my husband how much he could give the baby. Richard said that he had seen Judge West and all that he had to give was $8.00 and she asked him if that was all that he could give me for the baby and he didn't answer. She asked him how about $15.00 and he said that he had to see that his mother lived too and the only reason he married me was because he was afraid that my father would have had him locked up.

'I thought the next best thing to do was to file a complaint with Judge West. Raye Luckett had told me the time I could see Judge West. I went the next day but I don't recall the date. I talked to him and asked how much Richard would have to give the baby and he said that Richard had already been in there and was to come in the next day at 11:00 a. m. The next day I went down there and Judge West asked me how much did I think he should give me for the baby and I told him that I thought $15.00 and he told me that I had left Richard and I shouldn't be too hard on him and if I would take $10.00. Judge West asked Richard if it was alright with him. Richard said yes and Judge West asked me if it was ok. I said yes if I couldn't get any more and Judge West said Richard had been down and talked to him about getting a divorce. Judge West asked if I was willing to give him one, I said that I would if Richard didn't want me back and that I would give him one and Judge West asked Richard if he thought that we would go back and he said no that he didn't think that there was a possible chance. So Judge West asked if Richard would bring his mother in and I could bring my father there the next day because since we were both minors we would have to sign something and if Richard could bring $100.00 with him so that he could get the papers ready. He told us to come back 11:30 on a Thursday and I went down. I told Richard over the phone that I had changed my mind about giving him a divorce. When I went there I didn't see Judge West and I talked with a man who was tall and heavy set and he said that Richard had been in and talked with him. I told him that I wouldn't sign any papers and he said that the papers were not for a divorce but said that he was giving me $10.00 for the baby. And I said that I still didn't want to sign papers and he asked me why, did I think that there would be a reconciliation. I said that I would talk with Richard and see if we could go back together.'

'The facts in the above statement all took place sometime after

July 15th and before August 1st, 1953, the exact dates, I don't re-
member.'

*Clarice Ruth Williams*"

Mrs. Welke thereupon wrote the following news article, with the
exception of the headline, and it appeared that day on the front page
of The Alexandria Gazette:

**"ASKS JUDGE BE DISQUALIFIED AS COUNSEL IN OWN
COURTROOM**

"An Alexandria attorney today filed a notice in Corporation Court
asking that Juvenile and Domestic Relations Court Judge Marion B.
West be disqualified from acting as an attorney in a divorce suit in
his own courtroom.

"Attorney Otto L. Tucker filed the suit for his client, Mrs. Clarice
Ruth Williams, Negro, of 1111 Queen Street, whose husband Rich-
ard Clyde Williams, Negro, of 804 Pendleton St. had earlier filed
suit for divorce from her, with Judge West and Thomas A. Mickler
named in the suit as counsels for Mr. Williams.

"In the notice filed this afternoon, Mr. Tucker said he would ask
'on the first day of the September term of court that Judge West
and/or Mr. Mickler be disqualified to serve as counsels for the com-
plainant (Williams) because the above styled cause originated in the
Juvenile and Domestic Relations Court of Alexandria.' The cause
referred to the divorce proceedings.

"The notice filed by Mr. Tucker concluded: 'To proceed other-
wise would be further unjust, impartial, unfair, unethical and an
undue disadvantage to the defendant.' "

Mrs. Welke testified that she discovered the notice and affidavit in
making her daily routine check of the Clerk's Office; that after read-
ing their contents, she wrote the news article, and submitted it to the
editor of her newspaper; that prior to the institution of this action on
September 2, 1954, eleven months and twenty-nine days after the
publication of her report, she had never been asked by anyone to
correct the news article; that she did not know either the plaintiff,
or Otto L. Tucker, counsel in the divorce suit; that no one connected
with the defendant instructed her to find out what she could about
the plaintiffs, or in anywise assisted her in writing the article; and
that she was not influenced by any malicious motive.

It appeared that plaintiff, prior to the publication of the news
article, had been mentioned in other news stories relating to his

marital difficulties; that he did not indicate to the defendant his dissatisfaction with the news article, nor ask for a correction of it; and that he waited until one year, less a day, after the publication of the article to bring this proceeding. He offered no evidence of any actual damages suffered by him, nor of malice on the part of the defendant, save that he thought the defendant was "out to get him."

It was further shown that Thomas A. Mickler, one of counsel in the Williams' divorce proceeding, had on September 3, 1953, and for a year prior thereto, occupied space in the office of West, and had been associated as attorney with the plaintiff in certain court proceedings and cases.

Plaintiff bases his right to recover upon the headline in the news article and the language of the first paragraph thereof, contending that it is not a true and accurate account of the court record referred to, and imputes improper conduct to him as an attorney and judicial officer. Defendant did not file any plea of truth, but relied upon the ground that the news article was a fair and substantial report of a court record, and was, therefore, privileged.

There is no merit in the contention that the court erred in overruling the demurrer. Standing alone the motion was sufficient in law. At the time of the hearing on the demurrer, the evidence relating to privilege had not been developed.

"In Virginia both the truth and privilege are complete defenses in bar of any action for defamation, whether it be for common law slander or libel, or for insulting words; * * *." *Rosenberg* v. *Mason*, 157 Va. 215, 160 S. E. 190; *Guide Publishing Co.* v. *Futrell*, 175 Va. 77, 7 S. E. 2d 133; *Massey* v. *Jones*, 182 Va. 200, 208, 28 S. E. 2d 623.

Privileged communications are of two kinds, those absolutely privileged and those qualifiedly privileged, and an absolutely privileged communication is one for which an action will not lie, unless there has been an abuse of the privilege. *Penick* v. *Ratcliffe*, 149 Va. 618, 636, 140 S. E. 664; 12 M. J., Libel and Slander, § 18, page 59. We are not here concerned with the truth or falsity of the allegations in the notice and affidavit filed by Attorney Tucker; but with the question whether or not the news article was published in good faith and was a substantially correct report of the record in a judicial proceeding.

The publication of public records to which everyone has a right of access is privileged, if the publication is a fair and substantially correct statement of the transcript of the record. The incorrectness of

the record does not necessarily destroy the privilege, and its status is not changed by the falsity of the statement in the record. *Times-Dispatch* v. *Zoll*, 148 Va. 850, 858, 139 S. E. 505; *James* v. *Powell*, 154 Va. 96, 112, 152 S. E. 539; 12 M. J., Libel and Slander, § 19, page 62; 53 C. J. S., Libel and Slander, § 124, page 203; Newell on Slander and Libel, 4th Ed., § 456, page 498; 33 Am. Jur., Libel and Slander, § 154, page 149. See also *Broking* v. *Phoenix Newspapers*, 76 Ariz. 334, 264 P. 2d 413, 39 A. L. R. 2d 1382; *Bailey* v. *Charleston Mail Association*, 126 W. Va. 292, 27 S. E. 2d 837; and 39 Am. Jur., Newspapers and Press Associations, § 30, page 19.

"It is not necessary that the published report be verbatim, but it must be substantially correct." *James* v. *Powell, supra*, 154 Va. at page 112.

See also *Saleeby* v. *Free Press*, 197 Va. 761, 763, 91 S. E. 2d 405, 407, where, referring to Code § 8-631, it is said:

"It is not necessary to prove the literal truth of statements made. Slight inaccuracies of expression are immaterial provided the defamatory charge is true in substance, and it is sufficient to show that the imputation is 'substantially' true."

Privilege in reporting a judicial record is not measured by the legal sufficiency of the charges made in the judicial pleadings or the truth of those charges. The privilege consists of making a fair and substantially true account of the particular proceeding or record.

"The general rule, which has been repeatedly stated by this court, is that it is the court's duty to determine as a matter of law whether the occasion is privileged, while the question of whether or not the defendant was actuated by malice, and has abused the occasion and exceeded his privilege are questions of fact for the jury." *Bragg* v. *Elmore*, 152 Va. 312, 325, 147 S. E. 275; *Luhring* v. *Carter*, 193 Va. 529, 541, 69 S. E. 2d 416; 33 Am. Jur., Libel and Slander, § 296, pages 279 *et seq.*

"The libelous character of a newspaper article must be determined from the words used therein construed as a whole, and the article is not actionable unless the elements making it such are present in the article itself, or are fairly to be inferred from the article and the circumstances surrounding its publication." 53 C. J. S., Libel and Slander, § 121 b, page 198. See also 12 M. J., Libel and Slander, § 11, page 50.

Here all the facts in connection with the publication of the language complained of are without dispute. There is no conflict in

the testimony as to the facts upon which the claim of privilege rests. There are no mixed questions of law and fact to take the case to the jury as to whether or not the publication was made in good faith and was substantially correct.

It appears from the affidavit attached to the notice in the divorce action, and it is not disputed, that Mrs. Williams "went down to the Juvenile and Domestic Relations Court in Alexandria," to see West, the Judge of that Court, and to get his advice and assistance in patching up her marital difficulties with her husband and obtaining financial support for their child. She talked first to a social worker of that court, and was given an appointment to see the social worker the next morning with her husband. The social worker asked Williams how much he could give the baby, and he replied that he had seen Judge West and all he had to give was $8.00. Mrs. Williams went again to the Juvenile and Domestic Relations Court to see Judge West the next day, talked to him about the matter, and was told by Judge West that Williams "had already been in there and was to come the next day." She thought she ought to have $15.00, and West told her that she "had left Richard and should not be too hard on him." He asked her if she would take $10.00. She agreed to that if she couldn't get any more. Judge West then said that Williams had talked to him about getting a divorce and asked her if she "was willing to give him one," and she said she would if her husband didn't want her back. Williams replied that he did not want her back. West then asked Williams to bring his mother and Mrs. Williams to bring her father there the next day "to sign something" because they were minors, and that Williams bring $100.00 with him. She later telephoned her husband that she had changed her mind "about giving him a divorce;" but nevertheless went, on Thursday, to the Juvenile and Domestic Relations Court, saw a man who was "tall and heavy set," who said Williams had been in and talked with him. Mrs. Williams refused to sign any papers, and she was told that the papers were not for a divorce but that her husband was giving her $10.00 for the baby.

The statement in the affidavit shows, according to Mrs. Williams, that Judge West was consulted in or at the Juvenile and Domestic Relations Court by Mrs. Williams, when he had already been consulted by her husband about a divorce, and that he suggested she agree to permit her husband to obtain a divorce. Subsequently Judge West and the attorney who occupied a space in his office instituted, as counsel for Williams, a suit for divorce.

Section 31 of the Canons of Judicial Ethics provides that:

"Trial, civil and police justices, who by virtue of their office are not prohibited from practicing law, are in a position of great delicacy and should be scrupulously careful to avoid conduct in practice whereby any of them would seem to utilize their judicial position to further their professional success. None of them should practice in the court in which he is a judge, even when presided over by another judge, or appear therein for himself in any controversy." 194 Va. page clxv.

Moreover, a lawyer who is representing one person cannot fairly undertake to advise an opposite party. Nor should he accept employment as advocate in any matter upon the merits of which he has previously acted in a judicial capacity. Canon 36 of Professional Ethics, 194 Va. page clx.

The notice given by Tucker and the affidavit attached thereto state that the divorce cause "originated in the Juvenile and Domestic Relations Court of Alexandria, Virginia, or should have originated" in that court. This is an inaccurate statement of legal procedure, but doubtless has reference to the airing of the domestic difficulties of the parties in the Juvenile and Domestic Relations Court and the advice there given by the Judge of that Court. It is true that neither the motion nor the affidavit uses the word "courtroom," which the news article does; but in ordinary use and common acceptation, the difference is a matter of words only and not of principle.

Just as the word "church" oftentimes refers to a religious congregation, as well as to the edifice of such congregation, or the place where it meets, the word "court" refers sometimes to the judicial institution, at other times to the judicial officer, and still at other times to the place where a court is being held. The meaning of the word used must be determined from the whole context of the subject matter in which it is employed. The average person understands that when he is required to attend, or voluntarily goes to, a court he goes to a courtroom, or the place where the court is being held. Thus, when Mrs. Williams said, "I went down to the Juvenile and Domestic Relations Court," she obviously meant she went to the room or place where the business of that court was conducted.

The news article, as a whole, gives a clear picture of the motion made in the divorce case. It disclosed that a divorce suit was pending in the Corporation Court of the City of Alexandria, and that West was acting as counsel for the complainant in that suit. It showed that

West was Judge of the Juvenile and Domestic Relations Court. It quoted the exact language of counsel for defendant in the divorce suit that the "cause originated in the Juvenile and Domestic Relations Court of Alexandria, Virginia," and copied the prayer that West and Mickler be, for the reasons stated, disqualified to act as counsel in the divorce case. It did not state that West was acting as an attorney in his own courtroom. It merely said that he had been asked to be "disqualified from acting as an attorney in a divorce suit in his own courtroom."

The affidavit showed that the motion was based on the statement of Mrs. Williams that while she was seeking advice and help in the solution of her marital difficulties from West as Judge of the Juvenile and Domestic Relations Court, West was acting as counsel for her husband in the matter relative to a divorce proceeding subsequently instituted.

Had the affidavit attached to Attorney Tucker's notice been published, an imputation of improper conduct by West would, as we see it, have been much stronger than that contained in the news article complained of.

At the time of the publication of the article, West was a candidate to succeed himself as Judge of the Domestic and Relations Court. The office which had been an elective one had been changed to be appointive as of January 1, 1954. (1954 Cumulative Supplement, Code of Virginia, 1950, §16-172.4.) Yet West, strange to say, did not during his active campaign for appointment, or within eleven months and twenty-nine days after the publication, make any complaint to the defendant about the article, nor ask that it be corrected or amended.

The determination of whether or not the occasion was one of privilege is ordinarily a matter to be decided by the court and the court alone, where the evidence is not in conflict either as to the occasion of the privilege or the abuse thereof. Whether or not a particular utterance is a privileged communication depends upon the circumstances under which it is made. *Bragg* v. *Elmore, supra,* 152 Va. page 312. Cf. *Luhring* v. *Carter, supra,* 193 Va. page 541, and authorities cited.

We are of opinion that while the news article was not exactly correct, it constituted no substantial departure from the language in the notice and affidavit filed in the divorce proceeding. The facts upon which the claim of privilege is based and the question of its

abuse are so free from dispute as to require that it be held, as a matter of law, that the publication was privileged, and there was no abuse of the privilege. There being no dispute as to the facts and issues, there was no occasion to submit any factual issue to the jury.

In view of what we have said, there is no necessity to consider the assignments relating to instructions granted and refused. It is claimed by plaintiff that the instructions granted have been approved by this Court in former cases. However, the peculiar facts in the cases referred to are readily distinguishable from those present here, and nothing is better settled in this jurisdiction than that instructions must be based on the peculiar facts and circumstances of each particular case.

For the foregoing reasons, the judgment of the trial court is reversed, the verdict of the jury set aside, and the action dismissed.

*Reversed and dismissed.*