PRESENT: Hassell, C.J., Keenan, Koontz, Kinser, Lemons, and Agee, JJ., and Compton, S.J.

CLAUDE E. JORDAN, SR.

v.  Record No. 041885

J. CHRIS KOLLMAN, III

OPINION BY
JUSTICE G. STEVEN AGEE
April 22, 2005

J. CHRIS KOLLMAN, III

v.  Record No. 041861

CLAUDE E. JORDAN, SR.

FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Marc Jacobson, Judge Designate

Claude E. Jordan, Sr., a resident of the City of Colonial Heights ("the City"), appeals from the judgment of the Chesterfield County Circuit Court which awarded compensatory and punitive damages against him for defamation of J. Chris Kollman, III, the City's former mayor.  Kollman appeals the remittitur of the jury's award by the trial court.  For the reasons set forth below, we will reverse the judgment of the trial court and enter final judgment on behalf of Jordan.

I.  BACKGROUND AND PROCEEDINGS BELOW

Kollman, then the mayor and a member of the City Council of the City, was re-elected to the City Council in the May 7, 2002, municipal election.  On May 5, 2002, the Sunday before the election, Jordan, a private citizen, composed and paid for the

publication of two advertisements in <u>The Progress Index</u>, a

newspaper of general circulation in the City (collectively

"Jordan's ads").  The larger of Jordan's ads reads as follows:

**ATTENTION: ALL 10,000 COLONIAL HEIGHTS VOTERS**

Kollman/Hales/Farley voted to approve construction of over 200 apartments on Archer Avenue, mainly Federally subsidized, low income rentals . . .  certainly the worst Council action in our City's history . . . obviously the product of a lack of zoning vigilance . . . Is it true that the city had the opportunity to purchase the land on which the project is located something [sic] ago?  If so, why didn't Kollman/Hales/Farley and other council members purchase it and avoid all of these problems we now face and will continue to face forever more? . . . Bet you haven't seen or heard a word on the apartments from the incumbent . . . perhaps waiting until after the election to really tell the people what to expect . . .  these apartments are for real . . . ALL Voters should go and see . . . It's unbelievable that a massive housing project adjacent to a flood plain would be located in such a congested residential area . . . Think of the potential for crime, drugs, and demands on our school system . . . think of the impact on all of us . . . how much higher will reassessments go to pay the horrendous cost to the taxpayer . . . over $700,000 to widen Archer Avenue and untold costs for police, fire, and EMS services . . . Think of the pain from noise, frustration and inconvenience when 300-500 vehicles are dumped twice daily onto presently quite [sic] residential streets like Carroll, Chesterfield, and Cambridge and onto already congested Boulevard and traffic arteries like Hamilton, Lynchburg, Westover, Temple, and E. Ellerslie . . . we NEED 10,000 voters got go [sic] to the polls-rain or shine-to retire the incumbents who have held power for up to 20 years . . . VOTE (every vote counts) for the 3 challengers who have publicly stated NO MORE APARTMENT PROJECTS . . . the next one could be near you. **PLEASE Vote for BUREN, FREELAND, and WOOD ON MAY 7, 2002.**

C.E. Jordan

2

Paid for by C.E. Jordan

("the large ad").  The other of Jordan's ads states:

> Mr./Mrs. Colonial Heights:
>
> Don't like over 200 mostly Federally subsidized, low-income apartments? Say Good-bye to those who approved the apartments . . . Support and Vote for the 3 challengers who have publicly said "NO MORE APARTMENT PROJECTS!"
>
> VOTE BUREN,FREELAND AND WOOD
> ON TUESDAY, MAY 7, 2002
> Paid for by C.E. Jordan

("the small ad").

Kollman narrowly won reelection to the City Council, coming in third among six candidates for the three seats up for election.  John Wood and Milton Freeland, whom Jordan supported, came in first and second.  In July 2002, the City Council elected Wood as mayor.[1]

Prior to the City Council's mayoral vote, Kollman filed a motion for judgment on June 12, 2002, alleging that Jordan's ads in The Progress-Index defamed him.  Kollman alleged that the large ad falsely stated that he "voted to approve . . . over 200 . . . mainly Federally subsidized, low income rentals."  Kollman averred the small ad defamed him because it falsely implied he approved the apartment project as a member of City Council.  He

---

[1] In the City of Colonial Heights, the City Council elects the mayor from its members after each general election.  The mayor is a voting member of City Council.

3

asserted that Jordan's ads were false because "he never approved [the apartments] and actively opposed their construction."

Kollman alleged that Jordan's statements were malicious and libelous per se. Kollman contended the ads caused him to suffer "[i]mpairment of reputation; [d]iminished standing in the community; [p]ersonal humiliation; [i]njury and embarrassment; [e]motional distress and mental anguish; and [p]rofessional harm." Kollman sought compensatory damages of $1.0 million and punitive damages of $350,000.

Jordan filed a demurrer, a motion for summary judgment at the close of Kollman's evidence and a motion to strike before the case was submitted to the jury. He contended, among other things, that the ad statements were not defamatory because they were protected by the First Amendment as discussion of issues of public concern, that the statements were of opinion, and were true or substantially true. Jordan also contended that if either of the ads were a false statement, its publication was not made with actual malice. Jordan's demurrer was overruled and his motions were denied; however, the trial court ruled before trial that Jordan's ads, if libelous, were not defamatory per se but could only be defamatory per quod.[2]

_____

[2] Kollman made no objection to the trial court's ruling on this point and made no assignment of cross-error to it.

The jury returned its verdict for Kollman awarding compensatory damages of $75,000.00 and punitive damages of $125,000.00, plus pre-judgment interest of $4,990.26.  In response to Jordan's motion for remittitur, the trial court, by a letter opinion of April 1, 2004, put Kollman on terms to accept reduced compensatory and punitive awards of $15,000 and $35,000, respectively.  Kollman acceded to the remitted award and reserved his right to appeal pursuant to Code § 8.01-383.1.  The trial court entered an order to that effect and both parties filed notices of appeal.  We awarded an appeal to each party.

On appeal, Jordan assigns error to the trial court's: (1) overruling of his demurrer; (2) denial of his motion for summary judgment and subsequent motion to strike Kollman's evidence; (3) exclusion of all references to any actions the City Council took in relation to the Riverside Manor apartment development after the 2002 election; (4) exclusion of other paid political advertisements in The Progress-Index on May 5, 2002; (5) denial of Jordan's motion to set aside the jury's verdict or grant a new trial; and (6) failure, upon remittitur, to limit Kollman's recovery to nominal damages.  Kollman assigns error to the remittitur of his jury award and the elimination of pre-judgment interest.  He also alleges that the trial court erred in considering Jordan's net worth in its decision to remit the jury award.

II.  STANDARD OF REVIEW

Historically, a cause of action for defamation has been viewed as the means to protect a basic right because "[t]he individual's right to personal security includes his uninterrupted entitlement to enjoyment of his reputation."  The Gazette, Inc. v. Harris, 229 Va. 1, 7, 325 S.E.2d 713, 720 (1985) (citing Fuller v. Edwards, 180 Va. 191, 197, 22 S.E.2d 26, 29 (1942)).  In a written format, defamation is usually termed libel while spoken defamation, not reduced to writing, is slander.  See MacPherson v. Green, 197 Va. 27, 33, 87 S.E.2d 785, 789 (1955).

In Virginia, the elements of libel are (1) publication of (2) an actionable statement with (3) the requisite intent.  See generally The Gazette.  To be actionable, the statement must be both false and defamatory.  M. Rosenberg & Sons v. Craft, 182 Va. 512, 518, 29 S.E.2d 375, 378 (1944); Ewell v. Boutwell, 138 Va. 402, 415, 121 S.E. 912, 916 (1924).  See also Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1092 (4th Cir. 1993).  True statements do not support a cause of action for defamation.  American Communications Network, Inc. v. Williams, 264 Va. 336, 337, 568 S.E.2d 683, 684 (2002).  Further, statements of opinion are generally not actionable because such statements cannot be objectively characterized as true or false:

6

> Thus, speech which does not contain a provably false factual connotation, or statements which cannot reasonably be interpreted as stating actual facts about a person cannot form the basis of a common law defamation action. Statements that are relative in nature and depend largely upon the speaker's viewpoint are expressions of opinion.

Fuste v. Riverside Healthcare Ass'n, Inc., 265 Va. 127, 132-33, 575 S.E.2d 858, 861 (2003) (citations and internal quotation marks omitted). Whether a statement is an actionable statement of fact or non-actionable opinion is a matter of law to be determined by the court. Chaves v. Johnson, 230 Va. 112, 119, 335 S.E.2d 97, 101 (1985). We review such questions of law de novo. Turner v. Caplan, 268 Va. 122, 125, 596 S.E.2d 525, 527 (2004).

If a statement is not opinion, the plaintiff in a defamation action has the burden of proving that the statement is false. Williams v. Garraghty, 249 Va. 224, 235, 455 S.E.2d 209, 216 (1995). Further, "[s]light inaccuracies of expression are immaterial provided the defamatory charge is true in substance, and it is sufficient to show that the imputation is 'substantially' true." Saleeby v. Free Press, Inc., 197 Va. 761, 763, 91 S.E.2d 405, 407 (1956). A plaintiff may not rely on minor or irrelevant inaccuracies to state a claim for libel. See id. Whether a plaintiff has sufficiently proven the falsity of the alleged defamatory statements is a jury question. Thus, on appeal, we determine only whether there is sufficient

7

evidence to support the jury's decision.  A trial court's judgment will not be set aside unless it is plainly wrong or without evidence to support it. Code § 8.01-680.

The requisite intent a plaintiff must prove in a defamation action depends upon the plaintiff's status as a public or private figure and the damages sought.  While it is within the province of the states to "define . . . the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual," public figure plaintiffs are governed by the standard established in New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964).  Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 347 (1974).  In New York Times Co., 376 U.S. at 279-80, the United States Supreme Court ruled a public official is prohibited "from recovering [any] damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice.' "  The burden of proving "actual malice" is upon the plaintiff who must demonstrate by clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement.  Bose Corp. v. Consumers Union of the United States, Inc., 466 U.S. 485, 511, n.30 (1984).  To recover punitive damages, all defamation plaintiffs must show actual malice.  Gertz, 418 U.S. at 349-50.

8

As mayor of the City and an incumbent candidate for City Council, Kollman is a "public official" required to meet the New York Times malice standard. Ocala Star-Banner Co. v. Damron, 401 U.S. 295, 299 (1971) ("As the mayor . . . the respondent . . . was without question a 'public official' within the meaning given the term in New York Times"). As a public official, Kollman was required to prove actual malice in Jordan's publication of the advertisements in order to recover either compensatory or punitive damages for defamation.

In a defamation case, notwithstanding the jury's finding, we must make an independent review of the record. The Gazette, 229 Va. at 19, 325 S.E.2d at 727. We must decide

> whether the evidence in the record on appeal is sufficient to support a finding of New York Times "actual malice" by clear and convincing proof. . . . [We] must examine the facts pertinent to the [jury] award and exercise independent judgment to "determine whether the record establishes actual malice with convincing clarity."

Id., 325 S.E.2d at 727-28 (citations omitted). In the course of our independent review, we review the facts in the light most favorable to Kollman, the prevailing party below. Caplan v. Bogard, 264 Va. 219, 225, 563 S.E.2d 719, 722 (2002).

### III. ANALYSIS

The parties' dispute centers around Kollman's actions as mayor and a member of City Council in relation to the development of certain real property. In June 2000, RV Limited

9

Partnership ("RV"), a real estate developer, submitted a site plan to the Colonial Heights Planning Commission for the construction of the Riverview Apartments ("Riverview") on Archer Avenue in the City. The property was zoned for residential multi-family dwellings and had been so zoned since 1968. RV proposed to build an 88-unit apartment building for federally subsidized, low-income tenants.

Kollman and other members of City Council opposed Riverview because the site was in a flood plain and would require major expenditures by the City to widen Archer Avenue and to improve utility services. The City would also likely incur costs for increased police and fire protection, as well as greater public school expenses.

On December 5, 2000, Kollman, as mayor, wrote a letter to the Virginia Housing Development Authority ("VHDA"), expressing his concerns about Riverview: that the building site was in a floodplain, that the site may encroach on area wetlands, that the property was the site of an Indian burial ground, and that the City had no public transportation system to serve the needs of Riverview residents. Kollman testified at trial that he opposed the construction of Riverview because of these concerns, but that he knew that raising these issues could not stop, but only delay the project.

On December 12, 2000, City Council unanimously adopted and Kollman signed Resolution 00-49 to "clearly [express] the city's opposition to [the] proposed Riverview Apartments on Archer Avenue," which was transmitted to VHDA.  Kollman arranged a meeting with the Federal Emergency Management Agency, to determine whether RV could legally build on the Riverview site.  Kollman also sought the advice of the City Attorney, F. McCoy Little, to determine what further action the City Council could take against Riverview.  Specifically, Kollman asked Little if the City Council could pass a moratorium on apartment construction.  Little told Kollman that City Council did not have that authority.

Ralph M. Goldstein, RV's attorney, approached Little in 2001, to discuss the possible sale of the Riverview property to the City.  At a meeting with Little and Kollman, Goldstein conveyed RV's offer to sell the property for a price of $1.0 million.  Because Kollman did not have authority to accept RV's offer on behalf of the City, he called a meeting of City Council for a closed session to be held June 12, 2001.

At the City Council meeting in closed session, Goldstein presented a document detailing RV's expenditure of $682,530.07 in costs to develop the Riverview site and conveyed the offer to sell the property to the City for $1.0 million.  At the meeting, Kollman and the other City Council members understood that if

11

the City failed to purchase the property, RV would commence construction of Riverview on June 30, 2001.

While Code § 2.2-3711(B) prohibits a governing body, like the City Council, from taking a binding vote in a closed session, Kollman and the other attendees testified that the Council took a poll and reached a "consensus" to make an offer on the Riverview property. Subsequently, City Council authorized Little to offer RV $500,000 plus refunds of fees paid to the City in connection with the development of the property.

Little made the offer to Goldstein on June 14, 2001. On June 26, 2001, the City received Goldstein's letter on behalf of RV, rejecting the offer. The City Council made no further offer or any other effort to purchase the Riverview property.

On March 1, 2002, The Progress-Index carried an article featuring the Riverview construction project ("March 1st article"). Kollman was interviewed for the article and noted the City's opposition to the project in Resolution 00-49. The March 1st article also contained the following account of the City's failed bid to purchase the property from RV:

> At one point in the negotiations between [RV] and the city, Kollman told The Progress-Index that . . . [RV] offered to sell their 7.377 acres to the city for $1 million—a site that was assessed in 2000 at $60,300, according to city assessor Ken Stickler.
> "They'd done some work at that point," Kollman related, "and paid some permit fees." City Council, in closed session, made a counter offer of a half – million dollars, Kollman told The Progress-Index,

12

which [RV] did not accept.  No further negotiations were attempted by either party.

Kollman was quoted as to the number of units under construction at the time: "over 80 being built now at Riverview."

The March 1st article also mentioned another parcel of land located next to Riverview on Archer Avenue.  It was reported that in 1996, the owner of that property had been denied financing from the Department of Housing and Urban Development to develop low-income housing apartments called Riverview Manor.  However, the March 1st article went on to state that

> [the owner's] plans now call for 119 units.  He described his plan as "90 percent approved," provided he redo the site plans, meet all necessary criteria, and obtain financing.  His preliminary site plans were approved by the [City] Planning Commission in 1996.
>     "We've just been holding off until they do something with that road," [the owner] said of Archer Avenue.

Upon this factual milieu, we can proceed directly to Jordan's claim that Kollman's defamation action must fail because of the lack of proof of actual malice.  Based upon our independent review of the record, we agree with Jordan.

In Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 688 (1989), the United States Supreme Court noted that

> reckless disregard for the truth . . . requires more than a departure from reasonably prudent conduct.  There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication . . . . [and] that the defendant actually had a high degree of awareness of probable falsity.

13

(Citations and internal quotation marks omitted.)  Shenandoah Publ'g House, Inc. v. Gunter, 245 Va. 320, 324, 427 S.E.2d 370, 372 (1993) (adopting the "high degree of awareness" test for reckless disregard for the truth).  Based on the March 1st article, Jordan believed his advertisements represented the facts of the situation regarding the June 12, 2001, City Council action.  At trial, he testified that he believed that the ads were true at the time of writing and that he "stand[s] by those ads today."  Jordan argues that because he believed his ads were true, there is insufficient evidence to establish that he acted with actual malice.

Kollman contends, however, that under St. Amant v. Thompson, 390 U.S. 727, 732 (1968), Jordan's subjective belief that his statements were true is not sufficient to preclude the jury's finding of actual malice.  In St. Amant, the United States Supreme Court cautioned that

> [t]he defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. . . . Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

14

Id.

The record provides no clear and convincing evidence that Jordan's ads were "fabricated" by him or a "product of his imagination." Rather Jordan testified that he relied on public information as reported in the March 1st article for the content of his ads:

> I took the information that I knew that had happened in closed session . . . and I knew from reading [the March 1st article] that [the apartments] were federally subsidized low income rentals. . . . I knew there were 88 [units] in the Riverview [apartments] and I had heard . . . there were going to be a hundred or more built on the adjacent property, so I just used [200] as a figure.

There was no clear and convincing proof that there were "obvious reasons to doubt the veracity of the [March 1st article]." St. Amant, 390 U.S. at 732.

In The Gazette, 229 Va. at 50, 325 S.E.2d at 746, this Court affirmed a jury verdict in favor of a defamation plaintiff upon proof of actual malice because "[the defendant] abandoned all judgment and reason in composing and publishing the advertisement. [He had no] objective basis for the charge. . . . [and] no proper grounds [for his statement]."

By contrast, the March 1st article shows that Jordan had an objective basis to charge that Kollman voted to approve Riverview and a legitimate reason to contend Kollman's actions led to Riverview's development. Jordan was a concerned citizen

15

who believed in good faith that City Council had made an ill-advised decision which effectively allowed Riverview's construction.  We cannot find that there was clear and convincing evidence which would permit the jury to find Jordan acted with actual malice merely because he failed to comprehend the intricacies of City Council voting procedure.

Thus Jordan's assertion that his ads were substantially true is more than a subjective belief—it is an honest conviction grounded in good faith.  Because there is not sufficient evidence that Jordan published the advertisements with reckless disregard for the truth, the record does not support a finding that Jordan acted with actual malice.  Without a showing of actual malice, Kollman's defamation claim must fail.

## IV.  CONCLUSION

There is insufficient evidence in the record to support a finding under the clear and convincing proof standard that Jordan's ads in The Progress Index, which Kollman claimed as defamatory, were published with actual malice.  Thus, the trial court erred in denying Jordan's motion to strike the evidence and to set aside the jury's verdict.  Therefore, the judgment of the trial court will be reversed and final judgment will be entered for Jordan.[3]

---

[3] Because we reverse the trial court's judgment in favor of Kollman, we do not reach any of the issues in

16

Reversed and final judgment.

---

Kollman's appeal or any of Jordan's other assignments of error.