Present:  Hassell, C.J., Keenan, Koontz, Kinser, Lemons,
and Agee, JJ., and Russell, S.J.

TIMMY JACKSON

v.  Record No. 061505  OPINION BY JUSTICE CYNTHIA D. KINSER
                                          June 8, 2007
DENNIS A. HARTIG, ET AL.

        FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
               Junius P. Fulton, III, Judge


    This appeal involves an action for defamation brought

by an unsuccessful candidate for election to the Virginia

House of Delegates against the author and publisher of a

newspaper editorial endorsing the candidate's opponent.

Because we conclude that there are no material facts

genuinely in dispute and that the evidence in the record

would not permit a reasonable fact finder to conclude, by

clear and convincing evidence, that the defendants acted

with actual malice, we will affirm the judgment of the

circuit court granting summary judgment for the defendants

and dismissing the defamation action with prejudice.

                      FACTS AND PROCEEDINGS

    Timmy Jackson was elected to a four-year term on the

City of Virginia Beach School Board (the School Board) that

began in July 1994.  At that time, the outgoing School

Board had already approved a budget for the 1994-1995

school year.  In 1995, the School Board was notified that

it was operating at a deficit, prompting several members of the School Board to resign. A special grand jury convened to investigate the causes of the budget deficit, and on February 26, 1996, it issued a report recommending that the remaining members of the School Board who had served during the 1994-1995 school year resign or face criminal prosecution for violating Code § 22.1-91.[1] All School Board members except Jackson and Ferdinand V. Tolentino resigned. Jackson and Tolentino were each subsequently indicted for the misdemeanor charge of malfeasance related to the School Board budget deficit during the 1994-1995 school year, but a jury acquitted both on August 14, 1996. Jackson continued to serve on the School Board until the end of his term.

In 1998, Jackson ran for election to a seat on the Virginia Beach City Council. On May 3, 1998, the Virginian-Pilot, a newspaper published by Landmark

---

[1] Code § 22.1-91 provides:

No school board shall expend or contract to expend, in any fiscal year, any sum of money in excess of the funds available for school purposes for that fiscal year without the consent of the governing body or bodies appropriating funds to the school board. Any member of a school board or any division superintendent or other school officer violating, causing to be violated or voting to violate any provision of this section shall be guilty of malfeasance in office.

Communications, Inc. (Landmark), printed an editorial endorsing Jackson's candidacy for city council, stating:

> Jackson has achieved much on the School Board and promises to be a strong voice for education on council. This former police sergeant has shown himself to be a man of integrity who refused to allow himself to be bullied off the School Board by the commonwealth's attorney two years ago. Jackson insisted he was blameless in the matter of the school system's $12 million deficit – caused by the then-school superintendent and his deputies. A jury agreed, and Jackson was exonerated.

Despite the Virginian-Pilot's endorsement, Jackson lost the election for city council.

Jackson made another bid for public office in 2003, this time seeking to represent the twenty-first House of Delegates district.[2] On November 1, 2003, three days prior to the election, the Virginian-Pilot published an editorial written by Dennis A. Hartig that contained the following statements:

> [W]e have deep misgivings about Jackson's qualifications . . . .
>
> Jackson, a former police officer and Republican, was honored to be among the first citizens elected to the Virginia Beach School Board. It turned out badly.
>
> It was on his watch that the schools went millions of dollars in the red, a disaster that

---

[2] All of the twenty-first House of Delegates district is located within the City of Virginia Beach. Code § 24.2-304.01.

took years to overcome. Jackson was indicted for malfeasance, but was exonerated, then resigned.

Jackson has given us no reason why voters should forgive this blot on his record. Now he wants voters to trust him to oversee a state budget 200 times as large as the School Board's. That's asking too much.

On the morning of the election, the Virginian-Pilot, at Jackson's request, printed a correction of its misstatement that Jackson had resigned his seat on the School Board. Jackson lost the election.

Jackson subsequently filed a motion for judgment against Hartig and Landmark in the Circuit Court of the City of Portsmouth, alleging that Hartig and Landmark published false and defamatory statements about him in the Virginian-Pilot's November 1, 2003 editorial. Jackson claimed that Hartig and Landmark either knew that these statements were false at the time of their publication or printed them with reckless disregard for whether they were true or false. Jackson premised this allegation, in part, on their variance from the supposedly "factually accurate" statements appearing in the Virginian-Pilot's May 3, 1998 editorial. Jackson further alleged that Hartig and Landmark knew that the portion of the November 1, 2003 editorial stating, "It was on his watch that the schools went millions of dollars in the red" was false because the

4

defendants knew not only that the 1994-1995 School Board budget had already been approved when Jackson began his tenure on the School Board, but also that the School Board did not operate at a deficit during any of the years in which Jackson voted to approve the budget.  Jackson relied on these same alleged facts to assert that Hartig and Landmark knew their statement characterizing the deficit as "a disaster that took years to overcome" was false. Jackson also claimed that Hartig and Landmark knew that Jackson had not resigned from the School Board, but had publicly refused to do so.  Finally, the November 1, 2003 editorial, according to Jackson, accused him of criminal activity even though Hartig and Landmark knew that a jury had found Jackson not guilty of the malfeasance charge.

Along with a demurrer and grounds of defense, Hartig and Landmark filed a motion to transfer venue to the Circuit Court of the City of Virginia Beach.  The Circuit Court of the City of Portsmouth granted the defendants' motion, but it gave Jackson the option of having the case transferred to either the Circuit Court of the City of Virginia Beach or the Circuit Court of the City of Norfolk, where Landmark's corporate offices were located.  Without waiving his objection to the circuit court's decision granting the motion to transfer venue, Jackson chose the

Circuit Court of the City of Norfolk. Following the transfer of the case, that circuit court overruled the defendants' demurrer, and the parties proceeded with discovery.

Hartig and Landmark filed a motion for summary judgment, along with several exhibits, including a copy of the special grand jury's report and certain discovery responses. In particular, the circuit court had before it Jackson's answer to an interrogatory propounded to him by Hartig and Landmark, asking Jackson to "[i]dentify and describe in detail and with particularity any evidence you contend establishes that Mr. Hartig published the alleged defamatory statements with constitutional actual malice." Jackson responded:

> The editorial board failed to even review their own newspaper files concerning . . . my record, the trial and my exoneration, my continued service until the end of term (1994–1998), and their very own endorsement of me in May 1998, publishing factually accurate information stating the direct opposite of content in the November 1, 2003 editorial. Such reckless disregard for the truth or the Defendants' knowledge of the falsity of the defamatory content in the November 1, 2003 article constitutes actual malice. Moreover Mr. Hartig told me in a phone conversation on November 4, 2003 that I had to pay for the deficit.

Hartig and Landmark also included as an exhibit Hartig's response to Jackson's requests for admission, in which

6

Hartig admitted that he "had read the substantive provisions of the [special] [g]rand [j]ury [r]eport before the May 3, 1998 editorial was published."

Additionally, in their memorandum in support of the motion for summary judgment, Hartig and Landmark admitted that Hartig did not review either the Virginian-Pilot's files or its May 3, 1998 endorsement of Jackson for city council before writing the November 1, 2003 editorial. The defendants represented that Hartig was the managing editor of the Virginian-Pilot's "mainsheet" in 1998 and therefore, he neither wrote nor approved the newspaper's editorial endorsing Jackson's candidacy that year. Though Hartig and Landmark acknowledged that Hartig knew Jackson had been acquitted of the malfeasance charge brought against him in 1996, they maintained that such knowledge did not mean that Hartig knew that Jackson was not responsible for the budget deficit.

In a letter opinion, the circuit court summarized the contents of the November 1, 2003 editorial, concluding that it contained "several statements of fact which are not in dispute, statements of opinion which suggest that in spite of the jury verdict, Jackson was responsible for the [S]chool [B]oard budget deficit, and one factually false statement that Jackson eventually resigned his position

7

from the . . . School Board."  The court concluded that the statement characterizing the budget deficit as a "disaster that took years to overcome" was an opinion, and thus, not subject to an action for defamation.  The court further concluded that, although the statement that Jackson resigned from the School Board after being exonerated at trial was "false, [it did] not disparage him."  Finally, even though the circuit court believed that the November 1, 2003 editorial could be read as insinuating that Jackson had committed a crime, the court concluded that Jackson's acquittal on the charge of malfeasance was insufficient, by itself, to establish that the defendants had acted with actual malice.  Thus, the circuit court sustained the defendants' motion for summary judgment.

Jackson moved the circuit court to reconsider its ruling, submitting as exhibits deposition testimony by Jackson, Hartig, and Jackson's opponent in the 2003 election,[3] as well as copies of Virginian-Pilot news stories

---

[3] The record does not disclose any agreement between the parties allowing the use of depositions in the circuit court's consideration of Hartig and Landmark's motion for summary judgment.  Indeed, Jackson specifically noted an objection to such use of depositions on the circuit court's final order dismissing his motion for judgment with prejudice.  In the absence of such an agreement between the parties, deposition testimony was not properly before the circuit court and could not be used in considering whether to sustain a motion for summary judgment.  Code § 8.01-420;

8

covering Jackson's trial in 1996. Jackson also included notes compiled by Hartig and another member of the Virginian-Pilot editorial board during an interview with Jackson prior to the publication of the November 1, 2003 editorial. The notes purportedly indicated Jackson served a full, four-year term on the School Board.

Hartig and Landmark filed a memorandum in opposition to Jackson's motion to reconsider, attaching as an exhibit interrogatory responses wherein they detailed portions of the special grand jury report Hartig used in forming his opinion that Jackson, as a School Board member, bore some responsibility for the budget deficit. The defendants further stated in the interrogatory answer that, while preparing the November 1, 2003 editorial, Hartig reviewed several articles published in the Virginia-Pilot concerning the special grand jury report, which, according to Hartig, quoted the special grand jury's conclusions that

> (a) the School Board did not regard financial oversight as part of its responsibilities, (b) the School Board and the superintendent bore the ultimate legal responsibility for the deficit, (c) the overwhelming evidence was that School Board members, including [Jackson], committed malfeasance in office, and . . . (e) the School Board members, including [Jackson], should be indicted for malfeasance if they refused to resign.

---

Rule 3:20; Gay v. Norfolk & W. Ry. Co., 253 Va. 212, 214, 483 S.E.2d 216, 218 (1997).

The circuit court denied the motion to reconsider and dismissed Jackson's motion for judgment with prejudice. We awarded Jackson an appeal on two assignments of error. First, Jackson assigns error to the decision of the Circuit Court of the City of Norfolk to grant summary judgment for the defendants. Second, he challenges the ruling of the Circuit Court of the City of Portsmouth granting the change of venue.

ANALYSIS

In recognition of the importance of safeguarding an individual's basic entitlement to the uninterrupted enjoyment of his or her reputation, Virginia law allows a person who has been the subject of libel or slander to bring a cause of action for defamation. Tronfeld v. Nationwide Mut. Ins. Co., 272 Va. 709, 713, 636 S.E.2d 447, 449 (2006). To prevail on a claim for libel such as the one asserted by Jackson, a plaintiff in Virginia must establish the publication of a false and defamatory statement of fact with the requisite intent. Jordan v. Kollman, 269 Va. 569, 575, 612 S.E.2d 203, 206 (2005). Because the right to seek legal redress for another's defamatory statements is constrained by the protections of free speech established in the First Amendment to the

10

United States Constitution and Article I, Section 12 of the Constitution of Virginia, Yeagle v. Collegiate Times, 255 Va. 293, 295, 497 S.E.2d 136, 137 (1998), the intent required to prove defamation depends, in part, on whether a plaintiff is a public or private figure. Jordan, 269 Va. at 576, 612 S.E.2d at 207.

In that regard, the Supreme Court of the United States, in New York Times Co. v. Sullivan, 376 U.S. 254 (1964), held that the federal constitution's guarantees of the rights of the public and the press to engage in uninhibited debate concerning public issues required the formulation of a rule prohibiting a public official from recovering damages for defamatory falsehoods related to his official conduct except upon proof that the defamatory statement was made "with 'actual malice' – that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Id. at 279–80. The Supreme Court has since required proof of actual malice in cases where a political candidate asserts a claim for damages allegedly caused by defamatory statements touching on his fitness for office. Monitor Patriot Co. v. Roy, 401 U.S. 265, 271–72 (1971). As Jackson argues on brief, the obvious import of the November 1, 2003 editorial was to persuade voters that he had been "fiscally irresponsible

11

while serving on the School Board," and that they, therefore, should not elect him to another position of stewardship over public funds.  Therefore, since the alleged defamatory statements clearly spoke to Jackson's qualifications for elective office, this case falls squarely within the New York Times framework.  See Ocala Star-Banner Co. v. Damron, 401 U.S. 295, 300-01 (1971).

In order to establish actual malice, a plaintiff "must demonstrate by clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement."  Jordan, 269 Va. at 577, 612 S.E.2d at 207 (citing Bose Corp. v. Consumers Union of the United States, Inc., 466 U.S. 485, 511 n.30 (1984)).  In the context of this case, Jackson's defamation claim can survive summary judgment only if the pleadings, orders, admissions, and answers to interrogatories reveal a genuine dispute of material facts that would allow a reasonable fact finder to conclude Hartig and Landmark published the November 1, 2003 editorial either knowing that the statements contained therein were false or entertaining serious doubt that they were true.  Rules 3:20, 4:8(e); Klaiber v. Freemason Assocs., Inc., 266 Va. 478, 484, 587 S.E.2d 555, 558 (2003).  In reviewing the circuit court's decision to

12

sustain the defendants' motion for summary judgment, we review those specific portions of the record in the light most favorable to the nonmoving party, Jackson.  Id. at 481–82, 587 S.E.2d at 556.  We also accept "as true 'those inferences from the facts that are most favorable to the nonmoving party, unless the inferences are forced, strained, or contrary to reason.' "  Id. at 484, 587 S.E.2d at 558 (quoting Dudas v. Glenwood Golf Club, Inc., 261 Va. 133, 136, 540 S.E.2d 129, 130–31 (2001)).

As evidence of actual malice, Jackson now points to the facts in the record detailing the Virginian-Pilot's coverage of the events surrounding the School Board's budget deficit, Jackson's refusal to resign, his indictment, and his ultimate acquittal on the malfeasance charge.  According to Jackson, these news stories, as well as Hartig's prior position as managing editor of the newspaper's mainsheet and the Virginian-Pilot's May 3, 1998 endorsement of his candidacy for city council, demonstrate that Hartig knew Jackson had not committed malfeasance in office and that he had not resigned.  Jackson also relies on the interview notes generated by Hartig and another editorial board member that purportedly showed Jackson served a full, four-year term on the School Board. Additionally, Jackson directs our attention to Hartig's

13

statement in a telephone conversation with Jackson on November 4, 2003 that Jackson "had to pay for the deficit."

Viewing these facts in the light most favorable to Jackson, we conclude that they are insufficient as a matter of law to establish clear and convincing evidence that Hartig and Landmark published the statements in the November 1, 2003 editorial with actual malice. The mere presence of news stories in a newspaper's files containing information that contradicts an allegedly defamatory statement by the news organization is insufficient to establish actual malice. New York Times, 376 U.S. at 287. Furthermore, a media defendant in a defamation claim subject to the New York Times standard cannot be said to have acted with actual malice on account of its failure to investigate the accuracy of an allegedly defamatory statement before publishing it unless the defendant first "had a high degree of awareness of [its] probable falsity." Shenandoah Publ'g House, Inc. v. Gunter, 245 Va. 320, 324, 427 S.E.2d 370, 372 (1993); see also St. Amant v. Thompson, 390 U.S. 727, 731 (1968) ("[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to

14

the truth of his publication."). Thus, in the context of the actual malice inquiry, a duty to investigate the accuracy of one's statements does not arise until the publisher of those statements has a high degree of subjective awareness of their probable falsity. See Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 688 (1989) (citing Garrison v. Louisiana, 379 U.S. 64, 74 (1964)).

Acknowledging that a failure to investigate does not alone support a finding of actual malice, Jackson contends, nevertheless, that Hartig purposefully avoided the truth and thereby published the November 1, 2003 editorial with actual malice. See id. at 692 ("Although failure to investigate will not alone support a finding of actual malice, . . . the purposeful avoidance of the truth is in a different category."). We disagree. In particular, neither the incorrect statement that Jackson resigned from the School Board nor his acquittal establish that Hartig entertained any serious doubt about the truth of his statements asserting that Jackson had a "blot on his record" because he bore some degree of responsibility for the School Board's disastrous budget deficit even though he was acquitted of the criminal charge of malfeasance. That the Commonwealth failed to obtain a conviction against

15

Jackson for malfeasance in office does not, of its own force, impeach the reliability of the special grand jury report's statement that Jackson admitted under oath that he had "some level of responsibility for spending millions of dollars of public money they did not have." Furthermore, the evidence in the record, including the interview notes, does not establish that Hartig published the statement that Jackson resigned his seat on the School Board knowing the statement was false. "[T]o insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones." St. Amant, 390 U.S. at 732.

Additionally, Hartig stated in interrogatory answers that, before publishing the November 1, 2003 editorial, he had reviewed articles published by the Virginian-Pilot that quoted, among other things, the special grand jury's conclusions that "the School Board did not regard financial oversight as part of its responsibilities" and that "the School Board and the superintendent bore the ultimate legal responsibility for the deficit." As the circuit court correctly noted, without a fact in the record that would show Hartig had any reason to question the accuracy of the special grand jury's recitation of facts, such as evidence

16

showing he knew that witnesses before the special grand jury had perjured themselves, there is no basis for concluding that Hartig and Landmark had any serious doubt about the truth of their assertion that Jackson, despite his acquittal on the malfeasance charge, had some level of responsibility for the School Board's budget deficit.  See St. Amant, 390 U.S. at 731 (evidence must show that the defendant in fact had serious doubts about the truth of his publication).

Equally unavailing is Jackson's reference to Hartig's alleged comment to him, saying Jackson "had to pay for the deficit."  This fact does not speak to Hartig's state of mind at the time he published the editorial three days earlier.  Moreover, this statement, at most, suggests that Hartig harbored some kind of ill will toward Jackson. While "it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry," proof of a media defendant's ill will toward a public figure plaintiff is, without more, insufficient to establish knowledge of falsity or reckless disregard for the truth.  Harte-Hanks, 491 U.S. at 666, 668.

When, as in this case, allegedly defamatory statements discuss a candidate's fitness for elective office,

> [t]he importance to the state and to society of such discussions is so vast, and the advantages derived are so great, that they more than counterbalance the inconvenience of private persons whose conduct may be involved, and occasional injury to the reputations of individuals must yield to the public welfare, although at times such injury may be great.

Coleman v. MacLennan, 98 P. 281, 286 (Kan. 1908). "[T]here can be no doubt that discussion of public issues and debate on the qualifications of candidates for public office are integral to the operation of our system of government and are entitled to the broadest protection the First Amendment can afford." Mahan v. National Conservative Political Action Comm., 227 Va. 330, 336, 315 S.E.2d 829, 833 (1984).

CONCLUSION

We conclude that the circuit court properly entered summary judgment for Hartig and Landmark. Summary judgment is appropriate when "no material facts are genuinely in dispute." Klaiber, 266 Va. at 484, 587 S.E.2d at 558; see also Carwile v. Richmond Newspapers, Inc., 196 Va. 1, 5, 82 S.E.2d 588, 590 (1954) (summary judgment is appropriate "when it clearly appears that one of the parties is entitled to judgment within the framework of the case"). Our review of the record on the motion for summary judgment does not disclose any genuinely disputed material fact that would permit a reasonable fact finder to conclude that the

defendants published, either with actual knowledge of falsity or subjective serious doubts as to truth, the statements in Hartig's November 1, 2003 editorial asserting that Jackson, as a former School Board member, bore some degree of responsibility for the School Board's budget deficit despite his acquittal on the malfeasance charge. The absence of such a fact is fatal to Jackson's attempt to meet his constitutional burden of establishing that Hartig and Landmark published the allegedly defamatory statements with actual malice.  Accordingly, we will affirm the circuit court's judgment granting summary judgment in favor of Hartig and Landmark and dismissing Jackson's motion for judgment with prejudice.[4]

Affirmed.

SENIOR JUSTICE RUSSELL, with whom JUSTICE LEMONS joins, dissenting.

The majority opinion expresses well the law of libel that applies to this case.  I part company only with the majority's conclusion that the case was a proper subject for summary judgment.  After setting forth the applicable law of libel, the majority opinion engages in a detailed

---

[4] In light of our decision, it is not necessary to address Jackson's assignment of error challenging the circuit court's decision to transfer venue.  Venue is

19

analysis of the facts, drawing inferences from them and reaching conclusions based upon them. In my view, the majority thereby invades the province of a jury, as the trial court had done.

As the majority opinion states, Jackson, as a candidate for public office, had the burden of proving by clear and convincing evidence that the defendant published a defamatory falsehood touching upon his fitness for office that was motivated by "*New York Times* malice." That term is correctly defined as a statement of fact made "with knowledge that it was false or with reckless disregard of whether it was false or not." There was an abundance of evidence in the record from which a jury could have concluded that the defendants' publication met that standard. First, the defendants' statement that Jackson had resigned his office (impliedly in disgrace) was demonstrably false. Second, the defendants knew of its falsity when the statement was made. The newspaper had actually published an editorial five years earlier commending Jackson as a "man of integrity" for his refusal to allow himself to be "bullied off the School Board by the commonwealth's attorney." Jackson was prepared to offer in

concerned with the appropriate "place of trial," Code § 8.01-258, not the viability of a cause of action.

20

evidence handwritten notes taken by Hartig and another member of the paper's editorial board during an interview just prior to the defamatory publication showing that they knew that Jackson had served his full four-year term on the school board.  From this evidence alone, a jury could have found that the defendants, when making the false statements, had a "high degree of subjective awareness of their probable falsity."  Nothing more is required to meet the test of "*New York Times* malice."

The issue of the defendants' motivation and intent is one of fact for resolution by the jury, not one of law for determination by the court.

> It is a court's duty to decide as a matter of law whether a communication is privileged. But, the question whether a defendant was actuated by malice, and has abused the occasion and exceeded the privilege, is a question of fact for a jury.

Fuste v. Riverside Healthcare Ass'n, 265 Va. 127, 135, 575 S.E.2d 858, 863 (2003) (quoting Alexandria Gazette Corp. v. West, 198 Va. 154, 160, 93 S.E.2d 274, 279-80 (1956) (internal quotation marks omitted)).

> The general rule, which has been repeatedly stated by this court, is that . . . the question of whether or not the defendant was actuated by malice and . . . exceeded his privilege [is a question] of fact for the jury.

Alexandria Gazette, 198 Va. at 160, 93 S.E.2d at 279.

21

Because the issue of malice depends entirely upon a determination of the defendant's motive and intent at the time of making an allegedly defamatory statement, summary judgment is singularly inappropriate.

> [S]ummary judgment is seldom appropriate in cases wherein particular states of mind are decisive as elements of a claim or defense.  This reflects a general perception that whether as a matter of fact any particular state of mind exists can seldom be considered to be beyond reasonable dispute because this depends entirely upon the conflicting inferences to be drawn from evidence so likely to be circumstantial or, if direct, self-serving.

Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979).

Here, the defendants sought to justify their defamatory statements in 2003 by reliance on a report filed by a special grand jury in 1996.  The trial court found as a fact that this reliance was justified, notwithstanding all the events of which the defendants were aware that occurred during the next seven years, and the majority opinion agrees.  The majority opinion goes on to weigh the evidence upon which Jackson relied to establish the defendants' knowledge of the falsity of their statements and their motivation in making them.  A striking illustration of this appears where the majority opinion, after reviewing Jackson's evidence in this regard,

22

concludes:  "Viewing these facts in the light most favorable to Jackson, we conclude that they are insufficient as a matter of law to establish clear and convincing evidence that Hartig and Landmark published the statements . . . with actual malice."  It was entirely within the province of a properly instructed jury, not of the court, to weigh that evidence and determine what had been proved by clear and convincing evidence.  The majority opinion also flatly states:  "Furthermore, the evidence in the record does not establish that Hartig knew, at the time he published the incorrect statement, . . . that the statement was untrue."  That weighing of the facts ignores Hartig's notes taken at his interview with Jackson just before the statements were published, which showed the exact opposite.  A jury, had it been permitted to weigh the evidence, might have reached a very different conclusion.

Summary judgment is a drastic remedy, available only where there is no material fact genuinely in dispute.  It has the effect of short-circuiting the trial and cutting off the right of the parties to a trial by jury.  Unknown at common law, it applies only to cases in which no trial is necessary because no evidence could affect the result.  Shevel's, Inc. v. Southeastern Assocs., Inc., 228 Va. 175,

181, 320 S.E.2d 339, 342-43 (1984). In my view, this case falls far outside that category.

The constitutional guarantees of freedom of the press and freedom of speech are indeed fundamental to the ordered liberty of our people, but the constitutional right to trial by jury is no less so. Article I, Section 11 of the Constitution of Virginia provides, in pertinent part: "That in controversies respecting property, and in suits between man and man, trial by jury is preferable to any other, and ought to be held sacred." That provision, attributed to George Mason, has as much vitality in Virginia today as it did in 1776, when it became a part of our original constitution. See Bethel Investment Co. v. City of Hampton, 272 Va. 765, 769 n.2, 636 S.E.2d 466, 469 n.2 (2006).

In this case, the motive and intent of the defendants in publishing the allegedly defamatory editorial is an issue essential to a finding of the presence or absence of "*New York Times* malice." That issue turns on material facts, which in this case are genuinely in dispute. There was evidence in the record from which reasonable minds could draw differing conclusions as to those disputed facts. Jackson had a constitutional right to submit that dispute to a jury.

24

Because I think the majority opinion erroneously deprives Jackson of that right, I respectfully dissent.