**Adam KEY, Plaintiff**

v.

**Marion Gordon "Pat" ROBERTSON and Regent University, Defendants.**

**Civil Action No. 2:08cv174.**

United States District Court, E.D. Virginia, Norfolk Division.

June 5, 2009.

Michael Bruce Hamar, Michael B. Hamar PC, Norfolk, VA, Randell Lee Kallinen, Law Office of Randell L. Kallinen, Houston, TX, for Plaintiff.

William Delaney Bayliss, Brendan David O'Toole, Williams Mullen, Richmond, VA, for Defendants.

## *OPINION AND ORDER*

JEROME B. FRIEDMAN, District Judge.

Currently before the court are (1) motions for summary judgment, filed by defendants Marion Gordon "Pat" Robertson and Regent University ("Regent"), (2) plaintiff Adam Key's motion to enlarge his time to respond to those motions, (3) defendants' motion to strike plaintiff's untimely response to their motions for summary judgment, and (4) plaintiff's motion for leave to file a sur-reply to defendants' motions for summary judgment. Defendants have requested oral argument on their motions for summary judgment and to strike, and plaintiff has opposed defendants' request. After examination of the briefs and the record, this court determines that oral argument is unnecessary, as the facts and legal arguments are adequately presented, and the decisional process would not be aided significantly by oral argument. For the reasons stated herein, the court **DENIES** plaintiff's motion to enlarge his time to respond, **GRANTS** defendants' motion to strike plaintiff's opposition brief, **DENIES** plaintiff's motion for leave to file a sur-reply, **GRANTS** defendants' motions for summary judgment, and **DISMISSES** this matter, with prejudice.

## FACTUAL BACKGROUND

Because the court concludes below that it will deny plaintiff's untimely motion for an enlargement of time to respond to de-

fendants' motions for summary judgment, grant defendants' motion to strike plaintiff's untimely opposition brief, and deny plaintiff's motion for leave to file a surreply, the court considers defendants' motions for summary judgment—and, correspondingly, defendants' statements of undisputed facts contained therein—unopposed. The following facts, therefore, are drawn from those sources.

This lawsuit arises from a dispute between Adam Key, a former student at Regent University School of Law ("Regent Law"), and that school's chancellor and administration. Key enrolled at Regent Law in 2006 and began classes in August of that year. Although Key's first year of law school at Regent Law was, in the words of Regent, "confrontational, insubordinate and troubling" (Regent University's Memorandum in Support of Motion for Summary Judgment ("Regent Mem.") at 1), the events that lie at the heart of this litigation began in September 2007, when Key, then a second-year law student, viewed a video clip of Robertson on the popular video sharing website YouTube (http://www.youtube.com). The video clip depicted Robertson scratching his face with his middle finger. However, when the video clip was paused at a certain frame, it appeared that Robertson was "flipping the bird" at his viewing audience. Plaintiff uploaded this still frame image (the "image") of Robertson to his account on the popular social networking website Facebook (http://www.facebook.com) and set the image as the profile image for his account.

This act shortly thereafter came to the attention of Regent Law's administration. On September 24, 2007, Natt Gantt, Regent Law's Associate Dean for Student Affairs, requested to meet with plaintiff on the following day to discuss this act. At that September 25, 2007 meeting, Gantt asked plaintiff to remove the image from his Facebook account because it violated the Regent Standard of Personal Conduct's prohibition against profane or obscene behavior. Although plaintiff agreed in the course of that meeting to remove the image from his Facebook account, since Regent's prohibition included an exception for such expressions "when used in an appropriate academic context," plaintiff came away from the meeting with the impression that he could instead place the image in another such context.

As agreed, plaintiff thereafter removed the image from his Facebook account, but then posted a discussion of it, attaching the image, on "the Branch," which is "a public e-mail list on Regent's LISTSERV which is used as an informal community for Regent staff, faculty, and students." *See* http://www.regent.edu/admin/ctl/orientation/community/thebranch.cfm. The Branch is only accessible to those with regent.edu email addresses, and is distributed on a voluntary subscription basis. *Id.* In this connection, Regent maintains that "[n]o one at Regent advised Key to post the Robertson image on the Branch; nor did any Regent official inform Key that the Branch constituted a 'proper academic context' for posting the image." Regent Mem. at 3. In other words, if Key at any point actually believed that posting the image on the Branch would fall within the "academic context" exception to Regent's Standard of Personal Conduct governing profane or obscene expressions, that belief was formed without the imprimatur of Regent or any of its administrators. In the following days, plaintiff posted additional discussions relating to the image on the Branch, including a suggestion that "[t]he value the picture serves is to show that Pat Robertson is a very bad man." Regent Mem. at 4; Ex. G.

On September 27, 2007, Regent Law Dean Jeffrey Brauch joined Gantt in hold-

ing another meeting with plaintiff to discuss plaintiff's activities, after which plaintiff was given the choice of posting an apology for his conduct on the Branch or submitting a legal brief in support of his contention that Regent's disciplinary actions against him violated the American Bar Association's ("ABA") accreditation standards for law schools. Plaintiff opted for the latter course of action, submitting his brief on October 1, 2007 and further informing Brauch that he (1) demanded a trial pursuant to Regent Law's Honor Code before the school's Honor Council, (2) had retained counsel to assist in preparing to file a lawsuit against Regent, (3) intended to submit a formal complaint to the ABA challenging Regent Law's accreditation, and (4) intended to prepare and distribute to the U.S. media a press release detailing Regent's actions. Further email correspondence between plaintiff and Brauch ensued, and Brauch informed plaintiff on October 3, 2007 of his conclusion that plaintiff's actions raised issues both under Regent's Honor Code and its Standard of Personal Conduct.

After receiving Brauch's decision, plaintiff drafted his press release and attempted to deliver it to Regent's public relations department. While there, plaintiff "exhibited unusual behavior ... that frightened some employees," which led one of them to call the Regent police and inform them that plaintiff was " 'creating a disturbance' in the building." Regent Mem. at 6 (quoting Ex. J at 2). Although the employee admitted that "she ha[d] never heard or seen any threats" by plaintiff, and plaintiff was reportedly "respectful and coopera-

tive" when Regent police subsequently encountered him outside of her office, the report of the incident categorized it as "disorderly conduct." Plaintiff subsequently issued his press release to Regent and to the national media.

Upon receiving plaintiff's press release, Brauch emailed plaintiff, indicating that he believed plaintiff's press release misrepresented the nature of their prior interactions regarding plaintiff's activities. Brauch further explained that plaintiff's alleged violation of the Regent Standard of Personal Conduct would continue to be handled administratively by Gantt, whereas plaintiff's alleged lies and misrepresentations would be handled by Regent's Honor Council.

In the ensuing days, Regent Law's administration began receiving reports from students expressing concern and even fear about plaintiff's behavior and, indeed, his continued presence in classes at Regent Law.[1] Regent's memorandum in support of its motion for summary judgment discusses in detail (and attaches) reports from multiple students, including two of plaintiff's former roommates, an ex-girlfriend, and other acquaintances and classmates. See Regent Mem. at 7–10, 12; Exs. N–T, Z. These reports variously characterized plaintiff and his behavior as "unstable" and "erratic" (Ex. N), "on a rampage" (Ex. P), "militant, crazy, out to get people" (Ex. Q), "troubled" and "a threat to the students at Regent" (Ex. S), "very disturbed," and "a potential danger to Regent University and its students" (Ex. T). Several students communicated their belief that plaintiff

---

1. The court notes that the substantive contents of these student reports, which take the form of email correspondence with Regent administrators that was produced to plaintiff in the course of discovery in this case, are arguably hearsay. In this connection, though, the court also notes that Regent does not appear to cite these reports for the truth of their contents, but instead merely for their existence as the factual predicates for Regent's security concerns with regard to plaintiff. Likewise, the court only discusses the contents of these student reports for that purpose, and, of course, makes no finding as to their truth.

was likely "to snap" and "go nuts." Regent Mem. at 8; Exs. N, Q, Z.

More alarmingly, several students reported hearing that plaintiff owned a gun and kept it in his car. Regent Mem. at 8; Exs. N, O, R. These fears were particularly heightened by the tragic Virginia Tech massacre, which had occurred less than six months before the sequence of events at issue in this case. *See, e.g.*, Regent Mem. at 9; Exs. S (one former roommate noting that plaintiff "could turn out to be like the guy from Virginia Tech" and "may go on a shooting spree if not handled with care"), T (indicating that "the events that took place at Virginia Tech" motivated another former roommate to write to Regent Law's administration with his concerns). Consequently, some students had apparently even "planned their escape route" should a similar incident occur at Regent Law. Regent Mem. at 8; Ex. O. Plaintiff's ex-girlfriend reported that plaintiff had previously "wanted to get a gun and keep it at [her] house," but that she had refused. Regent Mem. at 8; Ex. Q. One of plaintiff's former roommates also reported that although he did "not want to create a false fear" and had never heard plaintiff say anything that he "took as a serious or deliberate threat," he reported that plaintiff had an "infatuation with firearms" and, during their time as roommates, plaintiff had "semi-seriously often talk[ed] about wanting to own weapons" and made "joking comments ... about wanting to own a gun." Regent Mem. at 9; Ex. T. Regent Law's administration was also made aware of plaintiff's interest in firearms and shooting ranges. Regent Mem. at 7, 12; Exs. M, Y.

On October 11, 2007, an article about Regent's pending disciplinary proceedings with respect to plaintiff's use of the image appeared in an area newspaper, *The Virginian–Pilot*. On that same day, Robertson issued a press release on Regent letterhead, which read as follows:

Regent University Statement From the Chancellor

**VIRGINIA BEACH, Va., October 11, 2007**—"It is Regent University's policy to foster our essential freedoms of expression and speech. While I am not permitted by privacy protection laws to comment on this specific story in the news, I will say that, in general, no action should be taken against anyone who exercises their freedom of speech and expression, and that includes criticism or satire of the chancellor.

However we do not feel that freedom of speech encompasses the practice of the deliberate manipulation of television images to transform an innocent gesture into something obscene."

Dr. M.G. "Pat" Robertson

Chancellor and President

Regent University

Marion Gordon "Pat" Robertson's Memorandum in Support of Motion for Summary Judgment ("Robertson Mem.") at 2; Ex. A.

On October 12, 2007, Gantt wrote a letter to plaintiff. *See* Regent Mem. Ex. U. In this letter, Gantt informed plaintiff of the safety concerns that had been expressed by plaintiff's classmates, and explained that these concerns went above and beyond the pending disciplinary proceedings stemming from plaintiff's posting of the image on the Branch. The letter explained that these reports from students caused Gantt "to be concerned about [plaintiff's] emotional well-being," and that, in light of "the security situation that school campuses face today, the University must pursue a course of action that diligently responds to these concerns." *Id.* Gantt further explained that Regent "want[ed] to pursue a response that does not simply discipline you for any wrongdo-

ing," but instead "also want[ed] to enhance [plaintiff's] emotional well-being and foster the well-being and safety of our campus community here at Regent." *Id.*

To that end, Gantt required plaintiff "to be evaluated by a mental health provider that is acceptable to the University and to undergo counseling if that provider deems appropriate." *Id.,* The letter further explained that plaintiff would "not be allowed to attend classes until the University receives and approves the report from the mental health provider and until [plaintiff] complete[s] successfully any treatment plan deemed appropriate by that provider." *Id.* Until that time, plaintiff was also "prohibited from coming onto the Regent University campus without prior notice to and approval by either Dean Brauch or" Gantt. *Id.* The letter also informed plaintiff that, during the course of these required actions, "the School of Law does not intend to pursue any disciplinary processes stemming from [plaintiff's] Branch postings," either "under the School of Law Honor Code or the University Standard of Conduct," and that his absences from classes would be excused. *Id.* Instead, the letter expressly "reserve[d] the right to pursue those processes at a later date." *Id.* Regent notes that, although this course of action had not previously been "expressly articulated" in Regent's Student Handbook (indeed, it was added as an amendment "on or about October 12, 2007"—the very day Gantt sent his letter to plaintiff), it "had been in place for some time and been applied in at least one other instance regarding a Regent Law student." Regent Mem. At 11 n. 4 (citing *Truell v. Regent Univ. Sch. of Law,* Civ. Action No. 2:04cv716, 2006 WL 2076769, at *2 (E.D.Va. July 21, 2006)) ("Brauch notified Plaintiff that she would not be admitted back to the school until she had submitted to psychiatric evaluations, which she would have to release to the law school."). Plain-

tiff refused to submit to any such mental health evaluation.

Whatever the substance of the rumors of plaintiff's gun ownership, it came to light from student and faculty reports during this period of time that plaintiff did, in fact, own—and had been carrying on his person on campus—an electrical stun device. Regent Mem. at 14; Exs. BB–DD. Plaintiff never notified Regent that he was carrying such a device on campus. Regent Mem. at 13. Brauch emailed plaintiff on Friday, October 19, 2007 regarding these reports, noting that plaintiff's possession of such a device on campus would "appear to be a violation of the Regent University Weapons Policy." Regent Mem. Ex. DD; *see also id.* Ex. AA. Brauch explained that the Student Handbook afforded plaintiff the opportunity to meet with him to discuss the matter and that he was happy to do so personally or telephonically, but he also indicated that "[b]ecause of the urgency of this matter, we must have the meeting on or before 5:00 p.m. on Wednesday October 24 or else" Brauch would render a decision based only on the information he already had. Regent Mem. Ex. DD. By reply email later that day, plaintiff contended that his device did not violate the Weapons Policy, based on his own "research into the subject" and the fact that this category of device was not explicitly listed in the Weapons Policy. *Id.* As Regent explains in its brief, however, the broad language and "Weapons include, but are not limited to" catch-all phrasing of the Weapons Policy would encompass such a device. Regent Mem. at 13; Ex. AA. Although plaintiff denied the accuracy of the date on which he reportedly carried the device on campus, he acknowledged that he did, in fact, "carr[y] it openly on [his] belt" on campus "sometime between Sept [sic] 8 when I purchased the device and when the holder broke," which plaintiff claimed occurred "on or about Monday

Sept [sic] 24." Regent Mem. Ex. DD. Plaintiff also acknowledged that, on one occasion, a fellow student had picked up the device and pressed the discharge button while the device was pointed at herself. *Id.* Plaintiff further claimed that another Regent student carried a stronger version of the same device possessed by plaintiff on campus with her, and that she had demonstrated use of the device to a professor and several students after a class. *Id.* Finally, plaintiff requested an in-person meeting with Branch to discuss the matter further. *Id.*

On Monday, October 22, 2007, Brauch emailed plaintiff, setting a meeting "to discuss [plaintiff's] suspected violation of the Weapons Policy" for the following day and explaining the logistics for that meeting, in light of its subject matter and plaintiff's general prohibition from coming on campus without prior approval. Regent Mem. Ex. EE. Plaintiff failed to appear at that meeting, and never called or emailed to explain or apologize for his absence. Regent Mem. at 15. Brauch emailed plaintiff again on Wednesday, October 24, 2007, affording plaintiff another opportunity to meet with him on Friday, October 26, 2007. Regent Mem. Ex. X. Brauch's email reiterated that if he did not hear from plaintiff, Regent would make a decision based on the information it had to date. *Id.*

Instead of responding to Brauch's email, on Thursday, October 25, 2007, plaintiff, with the assistance of retained counsel, filed an administrative grievance against Brauch, Gantt, Robertson, one of his former roommates, the other Regent student who allegedly carried the same stun device as he did, and other Regent students. Regent Mem. Ex. FF. On Friday, October 26, 2007, plaintiff again failed to appear at the scheduled meeting with Regent Law administrators. Regent Mem. at 15. By letter dated November 6, 2007, Brauch rejected plaintiff's grievance and suspended him from Regent Law for one year for violations of Regent's Weapons Policy and its Standard of Personal Conduct. Regent Mem. Ex. GG. The letter also communicated plaintiff's right to appeal Regent's administrative decision. *Id.* Plaintiff did not do so, but instead filed this lawsuit.

## PROCEDURAL HISTORY

The court already recounted much of the procedural history of this case in its Opinion and Order granting plaintiff's motion for leave to file a second amended complaint. *See Key v. Robertson,* Civ. Action No. 2:08cv174, slip op. at 2–3 (E.D.Va. Feb. 23, 2009). Plaintiff originally filed this lawsuit on November 29, 2007 in the U.S. District Court for the Southern District of Texas (the "Southern District of Texas"). The case was transferred to this court on April 11, 2008 pursuant to motions filed by defendants. On December 18, 2008, defendants requested that this court rule on the Rule 12(b)(6) aspects of those motions. On January 29, 2009, plaintiff moved this court for leave to file a second amended complaint. By Opinion and Order dated February 23, 2009, this court granted plaintiff's motion, denied defendants' motions to dismiss as moot, and set a new schedule for the case. Pursuant to that new schedule, defendants timely filed their answer and motions for summary judgment on March 16, 2009. Pursuant to this court's Local Civil Rule 7(F)(1) and Rule 6(d) of the Federal Rules of Civil Procedure, plaintiff's responses to defendants' motions were due by March 30, 2009. On the afternoon of April 2, 2009—three days after that deadline had elapsed—plaintiff filed a motion to enlarge his time to respond to defendants' motions for summary judgment, requesting that the court extend the deadline for plaintiff's response to April 9, 2009. In the early morning hours of April 10, 2009—the day

*after* the extended deadline requested in plaintiff's motion—plaintiff filed his forty-eight page response to defendants' motions for summary judgment. On April 14, 2009, defendants moved to strike plaintiff's response as untimely and for failure to comply with this court's Local Rules, and on April 16, 2009, filed a reply in further support of summary judgment. On April 27, 2009, plaintiff timely filed a response to defendants' motion to strike. As noted above, by letters dated April 28, 2009, defendants requested oral argument on their motions for summary judgment and to strike, and plaintiff opposed defendants' request. On May 18, 2009—over a month after defendants filed their reply on their motions for summary judgment—plaintiff moved for leave to file a sur-reply.

## STANDARDS OF REVIEW

### I. Plaintiff's Motion to Enlarge Time to Respond and Defendants' Motion to Strike

Rule 6(b) of the Federal Rules of Civil Procedure provides that a "court may, for good cause, extend the time" by which "an act may or must be done." Fed.R.Civ.P. 6(b). However, that Rule also provides in relevant part that "after the time has expired," as it had in this case, such extensions of time can only be granted by the court "on motion ... if the party failed to act because of excusable neglect." Fed. R.Civ.P. 6(b)(1)(B); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 895–97 & n. 5, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (explaining that "any *post* deadline extension must be 'upon motion made,' and is permissible only where the failure to meet the deadline 'was the result of excusable neglect'" and "*[a]fter* the time for filing has expired ... the court ... may extend the time only 'upon motion.' ").

Local Civil Rule 7(H) of this court requires that "[a]fter the filing of the complaint, all pleadings, motions, briefs, and filings of any kind must be timely filed with the Clerk's Office of the division in which the case is pending." E.D. Va. Local Civ. R. 7(H). Local Civil Rule 7(F)(1) provides that a party opposing a motion "shall file a responsive brief and such supporting documents as are appropriate, within eleven (11) days after service." E.D. Va. Local Civ. R. 7(F)(1). Rule 6(d) of the Federal Rules of Civil Procedure adds three days to this period. Fed. R.Civ.P. 6(d). Local Civil Rule 7(I) generally provides that "[a]ny requests for an extension of time relating to motions must be in writing and, in general, will be looked upon with disfavor." E.D. Va. Local Civ. R. 7(I).

Local Civil Rule 7(F)(1) also provides that "[a]ll motions, unless otherwise directed by the Court and except as noted hereinbelow in subsection 7(F)(2), shall be accompanied by a written brief setting forth a concise statement of the facts and supporting reasons, along with a citation of the authorities upon which the movant relies." E.D. Va. Local Civ. R. 7(F)(1). Although Local Civil Rule 7(F)(2) provides that "[b]riefs need not accompany motions for ... (b) an extension of time to respond to pleadings, unless the time has already expired," this provision is inapplicable, not merely because the time had, in fact, already expired days before plaintiff filed his motion, but instead because "a motion for summary judgment is not a 'responsive pleading.'" *Manning v. Greensville Mem'l Hosp.*, 470 F.Supp. 662, 671–72 (E.D.Va.1979): *see also Clardy v. Duke Univ.*, 299 F.2d 368, 369 (4th Cir.1962): *Jackson v. Wiley*, 352 F.Supp.2d 666, 676 (E.D.Va.2004).

Local Civil Rule 7(F)(3) requires that "responsive briefs, exclusive of affidavits and supporting documentation, shall not exceed thirty (30) 8–1/2 inch × 11 inch pages double-spaced." E.D. Va. Local Civ.

R. 7(F)(3). Although the court can, of course, grant exceptions to this page limitation to accommodate the nature and circumstances of a particular case or motion, it will only do so on the basis of "good cause shown in advance of filing." *Id.*

## II. Defendants' Motions for Summary Judgment

Summary judgment is appropriate when the court, viewing the record as a whole and in the light most favorable to the non-moving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.,* 763 F.2d 604, 610 (4th Cir.1985); Fed. R.Civ.P. 56(c). Although the initial burden obviously falls on the moving party, once the movant has properly filed evidence supporting summary judgment, the non-moving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts in the form of exhibits and sworn affidavits illustrating a genuine issue for trial. *Celotex,* 477 U.S. at 322–24, 106 S.Ct. 2548; *Cray Commc'ns, Inc. v. Novatel Computer Sys., Inc.,* 33 F.3d 390, 393–94 (4th Cir.1994). In other words, while the movant must carry the burden to show the absence of a genuine issue of material fact, when such burden is met, it is up to the non-movant to establish the existence of such an issue. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. When considering the non-moving party's submissions, "the facts and all reasonable inferences must be viewed in the light most favorable to the non-moving party." *Smith v. Va. Commonwealth Univ.,* 84 F.3d 672, 675 (4th Cir.1996) (*en banc*).

In determining whether the non-moving party has established the existence of a genuine issue of material fact, facts must be deemed "material" if they are necessary to the resolution of the case and "genuine" if they are based on more than speculation or inference. *Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.,* 57 F.3d 1317, 1323 (4th Cir.1995). If, after reviewing the record, it appears that a "a reasonable jury could return a verdict for [the nonmovant], then a genuine factual dispute exists and summary judgment is improper." *Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 958–59 (4th Cir.1996); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.").

## ANALYSIS

## I. Plaintiff's Untimely Opposition to Defendants' Summary Judgment Motions

As discussed above, defendants timely filed their motions for summary judgment on March 16, 2009, and plaintiff's opposition briefs were due by March 30, 2009. In violation of Local Civil Rules 7(F)(1) and 7(H), plaintiff failed to file any opposition brief in a timely fashion. Instead, plaintiff did not file his motion to enlarge his time to respond until three days after the deadline had elapsed. The court begins by noting that such motions are "looked upon with disfavor" even when timely filed. E.D. Va. Local Civ. R. 7(I), Needless to say, such disfavor can only increase when such a motion is itself not timely filed.

Plaintiff's motion also violated Local Civil Rule 7(F)(2)'s requirement that motions be accompanied by a separate brief, and did not attach the untimely opposition

brief for which plaintiff sought leave to file. Instead, plaintiff requested that the deadline be extended to April 9, 2009. Plaintiff notably failed even to meet the extended deadline that he himself requested: his opposition brief and exhibits were not filed until the early morning hours of April 10, 2009. Although plaintiff claims that this (doubly) late filing was due to the fact that he "experienced difficulties with the [electronic] filing system," the court cannot help but note that all of the purported "ECF error messages" that plaintiff submitted in support of his claims in this connection—including one shot of the last screen users see *before* a document is electronically filed—are, in fact, dated April 10, 2009. Plaintiff Key's Response to Defendants' Motion to Strike and as Supplement to Motion to Enlarge ("Strike Opp'n") at 4; Exs. 3A–3C. Accordingly, although the court obviously need not reach any definitive conclusions in this connection, plaintiff's own exhibits appear to suggest that he encountered these errors after midnight; *i.e.*, after his own requested filing deadline had *already* elapsed.

Plaintiff's opposition brief, at forty-eight pages in length (excluding the certificate of service), also violated Local Civil Rule 7(F)(3)'s requirement that "responsive briefs, exclusive of affidavits and supporting documentation, shall not exceed thirty (30) 8–1/2 inch × 11 inch pages double-spaced." E.D. Va. Local Civ. R. 7(F)(3). Although plaintiff points out that his opposition brief was "global," in the sense that it simultaneously responded to both defendants' summary judgment motions (*see* Strike Opp'n at 2–3), Local Civil Rule 7(F)(3)'s restrictions apply "[e]xcept for good cause shown *in advance* of filing." E.D. Va. Local Civ. R. 7(F)(3). Plaintiff did not make any such showing in advance of filing his untimely opposition brief; indeed, he did not even raise the issue in his motion to enlarge his time to respond.

With regard to the substance of plaintiff's motion, as defendants succinctly point out, plaintiff's "sole basis for requesting an extension was that his counsel had been 'extremely busy as of late.'" Defendants' Memorandum in Support of Motion to Strike Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment ("Strike Mem.") at 2 (quoting Plaintiff Key's Motion to Enlarge Summary Judgment Response Time ("Enlargement Mem.") at 2). Plaintiff subsequently attempted to explain that his local counsel was "not a federal litigator" and the longer period of time allowed by the district court in which he primarily practices "was so ingrained that [plaintiff's lead counsel] believed it was a Federal Rule of Civil Procedure." Strike Opp'n at 4. However, as noted by defendants, "'[i]gnorance of when a time period expires does not qualify as excusable neglect, nor does a busy schedule, lack of diligence, inadvertence, or other manifestations of carelessness and laxity.'" *Eagle Fire, Inc. v. Eagle Integrated Controls, Inc.*, Civ. Action No. 3:06cv264, 2006 WL 1720681, at *4 (E.D.Va. June 20, 2006) (quoting 1 James Wm. Moore et al., *Moore's Federal Practice* ¶ 6.06(3)(c)); *see also* Strike Mem. at 3. Moreover, "'[i]n most instances, mistaken reliance on provisions of the Rules or unfamiliarity with the Rules will not rise to the level of excusable neglect.'" *Eagle Fire*, 2006 WL 1720681, at *4 (quoting Moore, *supra*, ¶ 6.06(3)(c)). Plaintiff does not provide any reason in his motion that the court considers to be "excusable neglect" within the meaning of Rule 6(b)(1)(B) of the Federal Rules of Civil Procedure. Accordingly, the court will deny plaintiff's motion to enlarge his time to respond to defendants' motions for summary judgment. Consequently, since plaintiff's opposition brief was filed without leave of the court, the court will also grant defendants' motion to strike it from the

record. *See, e.g., Rossmann v. Lazarus,* 1:08cv316 (JCC), 2008 WL 4550579, at *1–2, 2008 U.S. Dist. LEXIS 78925, at *3–5 (E.D.Va. Oct. 7, 2008).

As a consequence of the court's decision to grant defendants' motion to strike, the court will, as a practical matter, also disregard defendants' reply, which appears to have been only filed provisionally, in response to plaintiff's untimely filing of his opposition brief. Since the court will not consider defendants' reply, there is, of course, no need for a sur-reply, rendering plaintiff's motion in this connection effectively moot. Even if the court were to consider defendants' reply brief, the court would not be inclined to grant plaintiff's motion, not least because doing so would effectively allow plaintiff to circumvent his own failure to meet the deadline for his original opposition brief. In either case, plaintiff's motion for leave to file a sur-reply will be denied.

## II. Defendants' Motions for Summary Judgment

■ As discussed above, the court has concluded that it will deny plaintiff's untimely motion for an enlargement of time to respond to defendants' motions for summary judgment, grant defendants' motion to strike plaintiff's untimely opposition brief, and deny plaintiff's motion for leave to file a sur-reply. Consequently, the court considers defendants' motions for summary judgment unopposed. This, however, does not by any means end the court's analysis of the motion. As the Fourth Circuit has explained:

> [F]ailure to respond [to another party's motion for summary judgment], however, does not fulfill the burdens imposed on moving parties by Rule 56. Section (c) of Rule 56 requires that the moving party establish, in addition to the absence of a dispute over any material fact, that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Although the failure of a party to respond to a summary judgment motion may leave uncontroverted those facts established by the motion, the moving party must still show that the uncontroverted facts entitle the party to "a judgment as a matter of law." The failure to respond to the motion does not automatically accomplish this. Thus, the court, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law. This duty of the court is restated in section (e) of the rule, providing, "if the adverse party does not so respond, summary judgment, *if appropriate,* shall be entered against the adverse party." Fed.R.Civ.P. 56(c).

*Custer v. Pan Am. Life Ins. Co.,* 12 F.3d 410, 416 (4th Cir.1993) (alteration in original). Accordingly, the court addresses the merits of each of the causes of action in plaintiff's Second Amended Original Complaint ("Compl.") below.

### A. Plaintiff's Constitutional and 42 U.S.C. § 1983 Claims

Plaintiff purports to bring this lawsuit against defendants under, *inter alia,* 42 U.S.C. § 1983 for violations of the First, Fifth, and Fourteenth Amendments to the United States Constitution. Compl. ¶¶ 5, 53–59. Although plaintiff admits that Regent is "a private institution" (Compl. ¶ 54; *see also* Compl. ¶ 5), he argues that it "should be subject to liability and injunctive relief under … 42 USC [sic] Section 1983" because Regent "receives vast direct and indirect federal and state funds." Compl. ¶ 5; *see also* Compl. ¶¶ 14, 54.

### 1. The "State Action" Requirement

■ "[I]t is fundamental that the First Amendment prohibits governmental infringement on the right of free speech.

Similarly, the Fourteenth Amendment, which prohibits the states from denying federal constitutional rights and which guarantees due process, applies to acts of the states, not to acts of private persons or entities." *Rendell–Baker v. Kohn*, 457 U.S. 830, 837–38, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (citing *Civil Rights Cases*, 109 U.S. 3, 11, 3 S.Ct. 18, 27 L.Ed. 835 (1883) and *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161 (1948)). The Fifth Amendment's due process clause correspondingly "appl[ies] to and restrict[s] only the Federal Government and not private persons." *Pub. Utils. Comm'n of D.C. v. Pollak*, 343 U.S. 451, 461, 72 S.Ct. 813, 96 L.Ed. 1068 (1952); *see also Freilich v. Bd. of Dirs. of Upper Chesapeake Health, Inc.*, 142 F.Supp.2d 679, 691–92 (D.Md.2001) ("Just as there must be state action to assert a Fourteenth Amendment claim, there must be some type of federal action to assert a claim under the Fifth Amendment due process clause.") (collecting cases). Likewise, " § 1983, which was enacted pursuant to the authority of Congress to enforce the Fourteenth Amendment, prohibits interference with federal rights under color of state law." *Rendell–Baker*, 457 U.S. at 838, 102 S.Ct. 2764. "In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." *United States v. Price*, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966) (quoted in *Rendell–Baker*, 457 U.S. at 838, 102 S.Ct. 2764). "If the action of [a defendant] school is not state action, [the] inquiry ends." *Rendell–Baker*, 457 U.S. at 838, 102 S.Ct. 2764.

 As noted above, plaintiff in this case claims that the "state action" requirement common to all of his constitutional claims and his 42 U.S.C. § 1983 claim is fulfilled because Regent "receives vast direct and indirect federal and state funds." Compl. ¶ 5; *see also* Compl. ¶ 54. However-

er, it is clear as a matter of law that, without more, a "school's receipt of public funds does not make [its] decisions acts of the State." *Rendell–Baker*, 457 U.S. at 840, 102 S.Ct. 2764; *see also Blum v. Yaretsky*, 457 U.S. 991, 1010–11, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (determining that the mere fact that "programs undertaken by the State result in substantial funding of the activities of a private entity" does not suffice to show state action for purposes of a Fourteenth Amendment claim); *Mentavlos v. Anderson*, 249 F.3d 301, 319 (4th Cir.2001); *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 347 (4th Cir.2000); *Haavistola v. Cmty. Fire Co. of Rising Sun, Inc.*, 6 F.3d 211, 215 (4th Cir.1993) ("[r]eceipt of state funds [alone] is ... insufficient to transform ... private actions into state actions") (quoting *Alcena v. Raine*, 692 F.Supp. 261, 267 (S.D.N.Y.1988)). Regent also notes that this court has previously commented in dicta in a previous case involving Regent that the defendants there, including Regent itself and Regent Law administrators, were "private actors, not the public actors or institutions that the Due Process Clause of the Fifth Amendment of the Constitution is designed to regulate." *Chadbourne v. Diggs*, Civ. Action No. 2:01cv944, slip op. at 4 (E.D.Va. July 10, 2002) (Morgan, J.) (citing *Hudgens v. NLRB*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976)); *see also* Regent Mem. at 17–18. As noted above, plaintiff has admitted that Regent is a private entity, and there is no suggestion in the instant case of any other form of state or federal action. Consequently, plaintiff's constitutional claims under 42 U.S.C. § 1983 fail as a matter of law for failure to fulfill the respective "state action" and "under color of state law" requirements.

### 2. Deprivation of a Property Interest

Regent also argues that even if plaintiff had fulfilled the state action requirement, he failed to show that he suffered any deprivation of life, liberty, or property as a result of defendants' alleged actions in this case. Regent argues in this connection that it is clear that a student has no property interest in his or her education. *See* Regent Mem. at 18–19; *Kelley v. Univ. of Richmond,* Civ. Action No. 3:06CV203–JRS, 2006 WL 1555933, at *2 ("This Court has held that a student has no property interest in her education."); *Davis v. George Mason Univ.,* 395 F.Supp.2d 331, 335–36 (E.D.Va.2005), *aff'd,* 193 Fed.Appx. 248 (4th Cir.2006) (holding that, in the absence of any interest created by Virginia law, a plaintiff "has no property interest in continued enrollment ... to support a claim for violation of Fifth Amendment procedural or substantive due process"); *but see, e.g., Lewin v. Med. Coll. of Hampton Rds.,* 910 F.Supp. 1161, 1164 (E.D.Va. 1996) (comparing cases and finding, for the purpose of disposing of a motion to dismiss, "that Plaintiff had a protectible property interest in continued enrollment, tree from arbitrary state action, at the Medical College"). However, as noted above, where the court finds no state action, as it has in this case, the "inquiry ends" there. *Rendell–Baker,* 457 U.S. at 838, 102 S.Ct. 2764. Accordingly, the court need not reach this question.

### B. Plaintiff's Higher Education Act Claim

■ Plaintiff claims that defendants' alleged actions in this case violated his speech and association rights under provisions of the Higher Education Act ("HEA"), specifically, 20 U.S.C. § 1011a. Compl. ¶¶ 61–62. As Regent succinctly argues, however, it appears clear as a matter of law that the Higher Education Act does not provide any express or implied private rights of action for violations of its provisions. *See, e.g., McCulloch v. PNC Bank, Inc.,* 298 F.3d 1217, 1221 (11th Cir. 2002) (noting the plaintiff's concession "that the HEA does not expressly confer a private right of action, as the HEA only provides for a suit brought by or against the Secretary of Education" and "not[ing] at the outset that nearly every court to consider the issue in the last twenty-five years has determined that there is no express or implied private right of action to enforce any of the HEA's provisions"); *see also Coll. Loan Corp. v. SLM Corp.,* 396 F.3d 588, 598 (4th Cir.2005) (citing *McCulloch* and acknowledging that "only the Secretary [of Education] is authorized to enforce the HEA"). Consequently, plaintiff's HEA claim also fails as a matter of law.

### C. Plaintiff's Title IX Claim

■ Plaintiff claims that Regent discriminated against him on the basis of his gender because he "could not have an electrical self-protection device and was suspended but" a female Regent law student "had no discipline when Regent knew she had the exact same device as [plaintiff] did on Regent's campus," in violation of Title IX, 20 U.S.C. § 1681. Compl. ¶ 47; *see also id.* ¶¶ 27, 44–48. Regent avers additional undisputed facts in this connection that show plaintiff's claim to be without merit.

Plaintiff notified Regent's administration of his fellow student's possession of the same type of stun device in his email on Friday, October 19, 2007. *See* Regent Mot. Ex. DD. On Monday, October 22, 2007—the same day that Brauch emailed plaintiff to set up a meeting regarding his possession of the stun device—Gantt contacted the other student by phone and email to set up a similar meeting with her. *See* Regent Mem. Exs. EE, II. Unlike plaintiff, who failed to appear at either of the meetings set up by Brauch to discuss

this issue and permit inspection of his stun device, the other student met with Gantt the very next morning and discussed the matter and Regent's Weapons Policy. *See* Regent Mem. Exs. II, JJ. The other student explained that she had recently been attacked in her apartment complex. *See* Regent Mem. Ex. JJ. After that meeting, the other student sent Gantt a letter, requesting permission to continue bringing her stun device on campus. *See* Regent Mem. Exs. KK, LL. However, Gantt denied the other student's request and explicitly informed her that her "bringing such a device on campus was a violation of the University weapons policy." Regent Mem. Ex. LL. The other student agreed not to bring the device on campus. Regent Mem. Ex. MM.

The court fails to see how there is any issue of gender discrimination implicated here. Plaintiff twice failed to avail himself of the opportunity afforded him by the Student Handbook to meet with Brauch to discuss the issue, despite having himself asked for such a meeting and having been explicitly informed that Regent's administration had to make a decision on the issue quickly, in light of its security-related nature. Regent Mem. Exs. X, DD. Instead, plaintiff merely claimed by email that, based on his own "research into the subject," his stun device did not violate the Weapons Policy. Regent Mem. Ex. DD. As Regent points out, it was not merely plaintiff's alleged violation of Regent's Weapons Policy, but instead his "refusal to cooperate with Regent administrators (and their similar concern for his safety and the safety of others given the specific, unsolicited student emails regarding [plaintiff's] behavior) [that] led to his disciplinary action." Regent Mem. at 22–23.

In light of these undisputed facts, the court need not delve deeply into the law governing such claims. Although plaintiff is correct to claim an implied private right of action under Title IX—*see* Compl. ¶¶ 45–46 (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 717, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979))—there is simply no differential treatment here that could possibly serve as the factual predicate for a Title IX claim. Accordingly, plaintiff's Title IX claim also fails.

### D. Plaintiff's Defamation Claim

■■■ Plaintiff claims that Robertson's October 11, 2007 press release, the entire substantive content of which is reproduced above on pages 6–7, "clearly defamed [plaintiff] when [Robertson] spoke to the media that [plaintiff] had 'manipulated' a television image when Pat Robertson knew that the image was an actual real true [sic] image from Robertson's TV show, the 700 Club. This caused [plaintiff] great embarrassment and he suffered mental anguish thereby." Compl. ¶ 63. Robertson argues that plaintiff's defamation claim fails for several distinct reasons.

First, Robertson claims that the press release cannot be considered to be speaking "of or concerning" plaintiff, since it nowhere mentions plaintiff's name and contains no specific details linking the press release's contents to him. *See* Robertson Mem. at 2–3 (citing *WJLA–TV v. Levin*, 264 Va. 140, 564 S.E.2d 383, 390 (2002)); *accord Houseman v. Publicaciones Paso del Norte, S.A. DE C.V.*, 242 S.W.3d 518, 526 (Tex.App.2007). The court notes, of course, that the press release's language to the effect that Robertson was "not permitted by privacy protection laws to comment on *this specific story* in the news"—Robertson Mem., Ex. A. (emphasis added)—along with its timing and content tend to belie Robertson's argument in this regard. Nevertheless, even if the court were to find that the press release was, in fact, intended to concern

plaintiff, his defamation claim would still fail for the reasons discussed below.

Robertson next argues that the contents of the press release are true, providing an absolute defense to plaintiff's defamation claim. *See* Robertson Mem. at 4 (citing *Alexandria Gazette Corp. v. West,* 198 Va. 154, 93 S.E.2d 274, 279 (1956)); *accord Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 646 (Tex.1995). Plaintiff's allegations of defamation with respect to the press release focus entirely on its use of the word "manipulation." Plaintiff claims that this language indirectly accuses him of having altered or "doctored" the image at issue in this case, when, in fact, the image was nothing more than a single, unaltered frame taken from a television broadcast. *See* Compl. ¶ 63. Robertson, on the other hand, argues that plaintiff

> took an innocent video clip of Robertson scratching his face, froze the image in the "flipping the bird" position, and then posted it on the Branch. Had [plaintiff] posted the entire clip, he would not have "manipulated" it. But by posting the still image, out of context and with the intent to convey a message Robertson never intended, [plaintiff] transformed an innocent gesture into an obscene and profane gesture clearly not intended by the Chancellor.

Robertson Mem. at 4. Robertson thus argues that plaintiff, by extracting a single frame from a paused video clip—*i.e.,* taking it out of the context in which it would otherwise normally appear—did, in fact, manipulate the image, and that therefore, even if the press release did relate specifically to plaintiff, its contents were entirely true, and thus incapable of being defamatory. The court finds Robertson's argument in this connection convincing.

■ Robertson also argues that, even if the press release did relate to plaintiff *and* contained falsehoods about him, plaintiff's defamation claim would still fail be-

cause the press release is not defamatory *per se*; *i.e.,* the statements it contained did not harm plaintiff's reputation in any way. *See* Robertson Mem. at 4 (citing *Chapin v. Knight–Ridder, Inc.,* 993 F.2d 1087, 1092 (4th Cir.1993) (explaining that defamatory statements "make the plaintiff appear odious, infamous, or ridiculous") (internal quotations omitted)); *accord Hardwick v. Houston Lighting & Power Co.,* 881 S.W.2d 195, 197 (Tex.App.1994). "Merely offensive or unpleasant statements are not defamatory. Whether a statement is actionable is a matter of law to be determined by the court." *Chapin,* 993 F.2d at 1092; *accord Hardwick,* 881 S.W.2d at 197. The court also finds Robertson's argument in this connection compelling. Nothing in the press release at issue could even remotely be construed to make plaintiff appear infamous or ridiculous, or to expose him to public hatred or contempt.

■ Robertson further argues that the press release is merely a statement of opinion, not of fact, and is, for that additional reason, not actionable. *See* Robertson Mem. at 5 (citing *Jordan v. Kollman,* 269 Va. 569, 612 S.E.2d 203, 206 (2005)); *accord Bentley v. Bunton,* 94 S.W.3d 561 (Tex.2002) (statements of opinion are not actionable as defamation unless they imply a speaker's knowledge of underlying facts forming the basis for the opinion). The court also agrees with Robertson with respect to this point. The press release at issue in this case is clearly couched in terms of opinion, not of verifiable fact (*i.e.,* "It is Regent University's policy," "we do not feel"). *See* Robertson Mem. Ex. A. Indeed, the press release is, on its face, simply a general policy statement, and not a comment on any specific event. Accordingly, it would not be actionable.

■ Finally, Robertson argues that there was no actual malice in issuing the press release, a requisite element of claims

of defamation by public figures pursuant to *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Robertson claims that plaintiff, by issuing his own press release and interacting extensively with the news media in connection with the specific events underlying this case, rendered himself a limited public figure for those purposes within the meaning of *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The court agrees. Indeed, plaintiff himself appears to have admitted as much (over his counsel's objection) in his deposition testimony. *See* Robertson Mem. Ex. C (excerpts from the transcript of plaintiff's February 3, 2009 deposition) at 196:3–197:11. Needless to say, there is nothing in the record before the court to suggest that plaintiff has shown (or could show) actual malice on the part of Robertson in issuing the press release. Thus, for the foregoing reasons, plaintiff's defamation claim is without merit.

### E. Plaintiff's Other State Law Claims

▮ Plaintiff also alleges a host of state constitutional and other state law claims. The court will address each such claim in turn. The court notes, as a preliminary matter, that

> federal courts should be reluctant to read private rights of action into state laws where state courts and state legislatures have not done so. Without clear and specific evidence of legislative intent, the creation of a private right of action by a federal court abrogates both the prerogatives of the political branches and the obvious authority of states to sculpt the content of state law.

*A & E Supply Co., Inc. v. Nationwide Mut. Fire Ins. Co.,* 798 F.2d 669, 674 (4th Cir.1986).

### 1. Plaintiff's Free Speech Claim under the Virginia State Constitution

▮ Plaintiff claims that defendants "punished [plaintiff] for speech and expression while on private property"—Compl. ¶ 52—in violation of article I, section 12 of the Virginia state constitution, which guarantees that "any citizen may freely speak, write, and publish his sentiments on all subjects." Va. Const. art. I, § 12. Plaintiff claims that this provision of the Virginia constitution, unlike the First Amendment to the United States Constitution, "does not limit the right to government or state action." Compl. ¶ 49; *see also id.* ¶¶ 50–52. However, the Supreme Court of Virginia has expressly rejected the argument that this provision is broader in its application than the First Amendment. *See Elliott v. Commonwealth,* 267 Va. 464, 593 S.E.2d 263, 269 (2004) (explaining that its prior statement in *Robert v. City of Norfolk,* 188 Va. 413, 49 S.E.2d 697, 700 (1948) that the "Constitution of Virginia is broader than that of the United States in providing that—'any citizen may freely speak, write, and publish his sentiments on all subjects'" was merely dictum). Instead, in *Elliott* the Virginia Supreme Court took the "opportunity to declare that Article I, § 12 of the Constitution of Virginia is coextensive with the free speech provisions of the federal First Amendment." 593 S.E.2d at 269. Consequently, even if the facts supported plaintiff's contention that he was punished for his speech regarding Robertson—which they do not appear to do—plaintiff's claim under article, section 12 of the Virginia state constitution would nevertheless fail for the same reasons that his First Amendment claim fails, as discussed above.

### 2. Plaintiff's Claims under the Texas Bill of Rights

▮ Plaintiff also claims that Regent violated his rights to freedom of speech

and assembly under the Texas state constitution's bill of rights. *See* Compl. ¶¶ 64–69. In response, Regent refers the court to the arguments made in opposition to these claims in Regent's original motion to dismiss (Docket No. 7), which was filed before this case was transferred to this court and subsequently rendered moot by this court's decision to grant plaintiff's motion for leave to file a second amended complaint. *See* Opinion and Order dated February 23, 2009 (Docket No. 37). As Regent argued there, the Texas Supreme Court has unequivocally held that "there is no implied private right of action for damages arising under the free speech and free assembly sections of the Texas Constitution." *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 147–49 (Tex.1995).

Plaintiff's request for injunctive relief in connection with these alleged violations— *see* Compl. at 23—also fails, but for a different reason. Although the Texas Supreme Court has held that "suits for equitable remedies for violation of constitutional rights are not prohibited"—*see Bouillion*, 896 S.W.2d at 149—its reasoning justifying such suits extends only to suits against state governmental entities. *See id.* (explaining that declaratory judgment actions to void laws that were allegedly contrary to constitutional provisions were what "[t]he framers of the Texas Constitution . . . intended to be the means of remedying a constitutional violation"); *City of Elsa v. M.A.L.*, 226 S.W.3d 390, 392 (Tex.2007) (per curiam) (quoting *Bouillion* in explaining "that 'suits for injunctive relief' may be maintained *against governmental entities* to remedy violations of the Texas Constitution") (emphasis added); *see also Harris County Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 850–52 (Tex.2009) (Jefferson, C.J., dissenting) (discussing the contours of the Texas Supreme Court's holding in *Bouillion* and noting its more recent decision in *City of Elsa* ). Consequently, defendants, as private actors, are no more susceptible to plaintiff's claims for injunctive relief under the Texas state constitution than they are to plaintiff's claims under the U.S. Constitution.

### 3. Plaintiff's Breach of Contract Claim

█ Plaintiff describes at substantial length the recruiting correspondence he received from Regent Law and Jay Alan Sekulow, Chief Counsel of the American Center for Law and Justice and a member of Regent's Board of Trustees and Regent Law's Board of Visitors. *See* Compl. ¶¶ 13–17. Plaintiff then claims that this correspondence, in combination with his decision to enroll as a student at Regent Law, constituted a "contract that Regent would respect religious liberty and First Amendment rights including freedom of religion, speech and assembly," and that Regent breached this contract with him when it suspended him. *Id.* ¶ 34. Plaintiff also claims that Regent's Student Handbook and an undefined agreement by Regent (apparently referring to his initial informal meeting with Gantt, in which Gantt requested that plaintiff remove the image from his Facebook account) constituted contracts that were broken by Regent when plaintiff was suspended. *Id.* ¶¶ 36–41.

The record available to the court in this case does not even remotely suggest the formation of any binding contract between plaintiff and defendants with respect to plaintiff's constitutional rights, federal or state. Neither the generic recruiting correspondence received by plaintiff nor his vague reference to agreements allegedly made by Regent suffice to suggest the existence of any such contract. Indeed, even if the court were to find that plaintiff and Gantt had formed some kind of contract at their initial meeting, Regent points out that plaintiff was not disciplined for

posting the image on Facebook, but instead for posting it on the Branch and for his violations of Regent's Weapons Policy. Moreover, as Regent points out, both Regent's Student Handbook and Regent Law's Policies and Procedures Manual contain clauses specifically providing that they create no contract between students and the university, and this court has previously reached that same conclusion. *See Truell v. Regent Univ. Sch. of Law*, Civ. Action No. 2:04cv716, 2006 WL 2076769, at *6–7 (E.D.Va. July 21, 2006); *Davis v. George Mason Univ.*, 395 F.Supp.2d 331, 337 (E.D.Va.2005). Accordingly, plaintiff's contract claims are without merit.

### 4. Plaintiff's Fraudulent Inducement and Detrimental Reliance Claims

In a related connection, plaintiff also claims that he was fraudulently induced to contract with Regent and that he "detrimentally relied on Regent's knowingly false promises of Freedom of Speech, Religion, and adherence to ABA standards on First Amendment rights applying to private schools." Compl. ¶ 71; *see also id.* ¶¶ 42–43. However, as Regent pointed out in its arguments in support of its earlier motion to dismiss, "[w]ithout a binding agreement, there is no detrimental reliance, and thus no fraudulent inducement claim. That is, when a party has not incurred a contractual obligation, it has not been induced to do anything." *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex.2001). Regent notes that this same element is required by Virginia law. *See* Regent Mem. at 27 (citing *J.E. Robert Co. v. J. Robert Co., Inc.*, 231 Va. 338, 343 S.E.2d 350, 353–54 (1986) and *Primrose Dev. Corp. v. Benchmark Acquisition Fund I Ltd. P'ship*, No. 19161, 1999 WL 378817, at *3–4, 1999 Va. Cir. LEXIS 666, at *9 (Va.Cir.Ct. Mar. 12, 1999)); *see also Brame v. Guar. Fin. Co.*, 139 Va. 394, 124 S.E. 477, 481 (1924) (discussing the elements of fraud in the inducement of a contract, including "that the party to

whom [the alleged misrepresentations] were made relied upon them, and was induced by them to enter into the contract") (quoting *Max Meadows Land & Improvement Co. v. Brady*, 92 Va. 71, 22 S.E. 845, 847 (1895)). Since the court has concluded that there is no evidence that any contract existed between plaintiff and defendants, let alone any evidence of any breach of such a contract, plaintiff's claims of fraudulent inducement and detrimental reliance must fail.

### 5. Plaintiff's Conspiracy Claim

█ Plaintiff claims that defendants "agreed to, and did, work in concert to prevent [plaintiff] from speaking thereby violating his Freedom of Religion, Speech and Assembly even though Defendants knew that [plaintiff's] actions were lawful and were protected by the First Amendment, Due [sic] process protections and contract law." Compl. ¶ 60. As Regent points out, it is well established as a matter of law that a corporate entity cannot conspire with itself or with its own agents or employees acting within the scope of their employment. *See, e.g., Perk v. Vector Res. Group, Ltd.*, 253 Va. 310, 485 S.E.2d 140, 144 (1997); *Charles E. Brauer Co. v. NationsBank*, 251 Va. 28, 466 S.E.2d 382, 387 (1996); *Fox v. Deese*, 234 Va. 412, 362 S.E.2d 699, 708 (1987); *accord Brown v. Carr*, C.A. No. C–08–170, 2008 WL 2571713, at *5 (S.D.Tex., June 26, 2008); *Bradford v. Vento*, 48 S.W.3d 749, 761 (Tex.2001). Robertson, of course, is the Chancellor and President of Regent, and obviously was acting in that capacity when he issued the press release and wrote the email at issue in this case. Consequently, even if there were any evidence that either Regent or Robertson had engaged in any unlawful acts—which there does not appear to be in this case—there could be no conspiracy between Robertson and Regent

in connection with such acts. Plaintiff's conspiracy claim must therefore also fail.

### 6. Plaintiff's Claim for Intentional Infliction of Emotional Distress

■ Plaintiff claims that he "can recover for intentional infliction of emotional distress against Defendants because they acted willfully and recklessly, and their conduct was extreme and outrageous. Defendants proximately caused [plaintiff] severe emotional distress." Compl. ¶ 70. Plaintiff offers no further details or factual support for these allegations. Indeed, there is nothing in the record before the court even remotely suggesting any extreme or outrageous conduct by defendants, intentional or otherwise, or any details of distress suffered by plaintiff that would be cognizable under this cause of action. Accordingly, plaintiff's claim must fail. See Almy v. Grisham, 273 Va. 68, 639 S.E.2d 182, 186 (2007) (citing Womack v. Eldridge, 215 Va. 338, 210 S.E.2d 145 (1974)); Russo v. White, 241 Va. 23, 400 S.E.2d 160, 163 (1991) (enumerating "objective physical injury," having "sought medical attention," confinement "at home or in a hospital," or "lost income" as examples of severe emotional distress); accord Brewerton v. Dalrymple, 997 S.W.2d 212, 215 (Tex.1999).

### 7. Plaintiff's Estoppel Claim

■ Plaintiff claims under "the equitable remedy of estoppel" that "Regent should be estopped from bringing any discipline or suspension based on [plaintiff's] speech and expression or of exercising his Freedom of Religion." Compl. ¶ 71. However, as Regent explains, the Virginia Supreme Court held unequivocally that "promissory estoppel 'is not a cognizable cause of action in the Commonwealth,'" Regent Mem. at 30 (quoting W.J. Schafer Assocs., Inc. v. Cordant, Inc., 254 Va. 514, 493 S.E.2d 512, 516 (1997)). Moreover, although Texas state law recognizes, in certain limited circumstances, a cause of action for reliance damages under a theory of promissory estoppel—see, e.g., Wheeler v. White, 398 S.W.2d 93, 97 (Tex.1966)—there is simply no evidence in the record before the court in this case that defendants made any promises, let alone offers to contract, upon which plaintiff could have relied to his detriment. Accordingly, plaintiff's estoppel claim also fails.

### CONCLUSION

For the foregoing reasons, the court **DENIES** plaintiff's motion to enlarge his time to respond to defendants' motions for summary judgment, **GRANTS** defendants' motion to strike plaintiff's untimely opposition brief, which was filed without leave of the court, **DENIES** plaintiff's motion for leave to file a sur-reply to defendants' motions for summary judgment, **GRANTS** defendants' motions for summary judgment, and **DISMISSES** this matter, with prejudice.

The Clerk is **ORDERED** to strike plaintiff's opposition to defendants' motions for summary judgment from the docket and **REQUESTED** to send a copy of this Opinion and Order to counsel of record for the parties.

It is so **ORDERED.**